832 A.2d 962

**COMMONWEALTH of Pennsylvania, Appellant**

**v.**

**Gomer Robert WILLIAMS, Appellee.**

**Commonwealth of Pennsylvania, Appellant**

**v.**

**Bruce Peters, Appellee.**

Supreme Court of Pennsylvania.

Argued April 8, 2002.

Decided Sept. 25, 2003.

488

James Kenneth Vogel, Erie, for the Com. of PA, Appellant.

Amy M. Elliott, for Sexual Offenders Assessment Bd., Amicus Curiae Appellant.

Ines M. Massella; Leonard Sosnov, Wilmington, DE; Joseph Paul Burt, Erie, for Gomer Robert Williams, Appellee.

Leonard Sosnov, Wilmington, DE; James Andrew Pitonyak, Erie, for Bruce Peters, Appellee.

Karl Baker, Philadelphia, for Defender Ass'n of Philadelphia, Appellee Amicus Curiae.

Andrea F. McKenna, Harrisburg, Robert A. Graci, Pittsburgh, for Atty. Gen. Office, Com. of PA.

Before: ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## OPINION

JUSTICE SAYLOR.

These are consolidated direct appeals from the orders of the Court of Common Pleas of Erie County, striking down certain provisions of the statute commonly known as Megan's Law, as amended in 2000. The primary question presented is whether the statute's registration, notification, and counseling requirements, applicable to individuals deemed sexually violent predators, constitute criminal punishment. Because we find that they do not, we reverse the trial court's orders and remand for further proceedings.

## I.

On July 27, 2000, Appellee Gomer Williams sexually assaulted a seventeen-year-old girl at knifepoint in the women's restroom of a movie theater. On March 21, 2001, Williams pleaded guilty to rape, involuntary deviate sexual intercourse (IDSI), aggravated assault, terroristic threats, and possessing instruments of crime.[1] As rape and IDSI are predicate offenses triggering an adjudication of sexually violent predator

1. See 18 Pa.C.S. §§ 3121, 3123, 2702, 2706, and 907, respectively.

status under Pennsylvania's Registration of Sexual Offenders Act (hereinafter, "Megan's Law II" or the "Act"),[2] *see* 42 Pa.C.S. §§ 9795.4(a), 9795.1(b)(2), the trial court ordered the State Sexual Offenders Assessment Board (the Board) to evaluate whether Williams is a sexually violent predator. Thereafter, on March 26, 2001, Williams filed a Motion for Extraordinary Relief, arguing that the sexually violent predator provisions of Megan's Law II violate the United States and Pennsylvania Constitutions. By opinion and order dated June 20, 2001, the trial court granted the motion and declared the challenged provisions unconstitutional. After Williams was sentenced,[3] the Commonwealth filed a timely notice of appeal, seeking relief from the trial court's declaration that the disputed portions of the Act are constitutionally infirm.[4]

Appellee Bruce Peters was charged with IDSI for allegedly performing sexual acts upon his minor stepson on January 27, 2001. On May 2, 2001, Peters pleaded guilty to that offense before the same trial judge as Appellee Williams, whereupon the trial court ordered the Board to assess whether Peters is a sexually violent predator. On August 1, 2001, Peters filed a Motion for Relief, requesting a declaration that Megan's Law II's sexually violent predator provisions would not be applied to him, and citing the trial court's June 20, 2001, order as to Appellee Williams. The court granted Peters' motion the same day based upon its decision in Williams' case. Peters was then sentenced, and the Commonwealth filed a timely notice of appeal.

2. Act of May 10, 2000, P.L. 74, No. 18 (as amended, 42 Pa.C.S. §§ 9791–9799.7). The statute is referred to as "Megan's Law II" because the General Assembly enacted a prior version of Megan's Law in 1995, *see* Act of Oct. 24, 1995, P.L. 1079 (Spec. Sess. No. 1), discussed *infra*, substantial portions of which were ultimately deemed unconstitutional. *See Commonwealth v. Williams*, 557 Pa. 285, 733 A.2d 593 (1999).

3. At the time of sentencing, on June 26, 2001, the court had apparently received the Board's assessment, *see* N.T. 6/26/01, at 20, although the record is silent regarding the Board's determination. The parties do not contend that such determination is relevant to this Court's present review of the constitutionality of the challenged provisions.

4. This Court has exclusive appellate jurisdiction pursuant to Section 722(7) of the Judicial Code, 42 Pa.C.S. § 722(7).

## II.

In 1995, the General Assembly amended the Sentencing Code by adding Subchapter H, entitled "Registration of Sexual Offenders," codified at 42 Pa.C.S. §§ 9791–9799, and generally referred to as "Megan's Law" (hereinafter, "Megan's Law I"). Among other things, Megan's Law I established a procedure for adjudicating certain offenders—namely, those that committed one of the predicate offenses listed in the statute—as "sexually violent predators." The mandated procedure included a post-conviction, pre-sentence assessment by the Board, followed by a hearing before the trial court. At the hearing, the offender was presumed to be a sexually violent predator and bore the burden of rebutting such presumption by clear and convincing evidence. If the individual was adjudicated a sexually violent predator, he was subjected to an enhanced maximum sentence of life imprisonment for the predicate offense, as well as registration and community notification requirements that were more extensive than those applicable to an offender who was not adjudicated a sexually violent predator.

In *Commonwealth v. Williams,* 557 Pa. 285, 733 A.2d 593 (1999) (*Williams I*),[5] this Court struck down the sexually violent predator provisions of Megan's Law I based upon the conclusion that a finding of sexually violent predator status under that enactment entailed a "separate factual determination, the end result of which is the imposition of criminal punishment," i.e., increasing the offender's maximum term of confinement above the statutory maximum for the underlying offense. *See id.* at 304, 733 A.2d at 603. Thus, the defendant was entitled to the "full panoply of relevant protections which due process guarantees," including a presumption of innocence. *Id.* As the statute placed the burden upon the registrant to prove that he was not a sexually violent predator, it failed Fourteenth Amendment scrutiny. *See id.* Notably, in view of the punitive nature of the increased maximum prison sentence, the *Williams I* Court invalidated the challenged

5. There is no apparent relationship between Appellee Williams and the individual involved in the *Williams I* case.

provisions without reaching the question of whether the enhanced registration and notification requirements constituted criminal punishment. *See id.* at 302 n. 10, 733 A.2d at 602 n. 10.

After *Williams I* was decided, the General Assembly passed Megan's Law II, which was signed into law on May 10, 2000. Although the stated legislative policy remained the same as in Megan's Law I, *see* 42 Pa.C.S. § 9793(b) (discussed *infra*), the General Assembly altered the manner in which an individual convicted of a predicate offense was adjudicated a sexually violent predator. The critical distinction, for present purposes, is that, under Megan's Law II an offender convicted of an enumerated predicate offense is no longer presumed to be a sexually violent predator. Rather, the Commonwealth bears the burden of proving such status by clear and convincing evidence. *See* 42 Pa.C.S. § 9795.4(e)(3).[6] Additionally, per-

**6.** In relevant part, the assessment procedure is as follows:

**(a) Order for assessment.**—After conviction but before sentencing, a court shall order an individual convicted of an offense specified in section 9795.1 (relating to registration) to be assessed by the board. The order for an assessment shall be sent to the administrative officer of the board within ten days of the date of conviction.

**(b) Assessment.**—Upon receipt from the court of an order for an assessment, a member of the board as designated by the administrative officer of the board shall conduct an assessment of the individual to determine if the individual should be classified as a sexually violent predator. The board shall establish standards for evaluations and for evaluators conducting the assessments. . . .

\* \* \* \* \*

**(d) Submission of report by board.**—The board shall submit a written report containing its assessment to the district attorney no later than 90 days from the date of conviction of the individual.

**(e) Hearing.**—(1) A hearing to determine whether the individual is a sexually violent predator shall be scheduled upon the praecipe filed by the district attorney. The district attorney upon filing a praecipe shall serve a copy of same upon defense counsel together with a copy of the report of the board. (2) The individual and district attorney shall be given notice of the hearing and an opportunity to be heard, the right to call witnesses, the right to call expert witnesses and the right to cross-examine witnesses. In addition, the individual shall have the right to counsel and to have a lawyer appointed to represent him if he cannot afford one. If the individual requests another expert assessment, the individual shall provide a copy of the expert assessment to the district attorney prior to the hearing. (3) At the hearing prior to sentencing the court shall determine whether the Common-

sons adjudicated to be sexually violent predators are no longer subjected to an automatic increased maximum term of imprisonment for the predicate offense. Instead, they are required to undergo lifetime registration, notification, and counseling procedures; failure to comply with such procedures is penalized by a term of probation or imprisonment.[7]

Under Megan's Law II, any offender convicted of a predicate offense, whether or not he is deemed a sexually violent predator, must: (1) register his current residence or intended residence with the state police upon release from incarceration, parole from a correctional institution, or commencement of an intermediate punishment or probation; (2) inform the state police within ten days of a change of residence; and (3) register within ten days with a new law enforcement agency after establishing residence in another state. *See* 42 Pa.C.S. § 9795.2(a).[8] State police officials then forward this data, together with fingerprint and photographic information obtained from the sentencing court, *see* 42 Pa.C.S. § 9795.3(4), to the chief of police of the locality where the offender will reside following his change of address or release from prison. *See* 42 Pa.C.S. § 9795.2(c). For sexually violent predators, the police chief in turn notifies the individual's neighbors, as well as day care operators and school officials within the municipality. *See* 42 Pa.C.S. § 9798(b). The data sent to these recipients includes the offender's name, address, offense, and photograph (if available), as well as the fact that he has been determined by a court to be a sexually violent predator, "which determina-

wealth has proved by clear and convincing evidence that the individual is a sexually violent predator. . . .

**(f) Presentence investigation.**—In all cases where the board has performed an assessment pursuant to this section, copies of the report shall be provided to the agency preparing the presentence investigation.

42 Pa.C.S. § 9795.4.

7. The constitutionality of these enforcement provisions is considered separately in Section III(C), *infra*.

8. Pursuant to a recent legislative amendment, *see* Act of Oct. 17, 2002, P.L. 880, No. 127, § 4, Section 9795.2 now requires offenders and sexually violent predators to provide employment and academic enrollment information to the police. This revision is not presently before the Court.

tion has or has not been terminated as of a date certain."[9] *See* 42 Pa.C.S. § 9798(a). The sexually violent predator's name and address, including any subsequent change of address, is also sent to the victim of the offense, until the victim requests that such notification be terminated. *See* 42 Pa.C.S. § 9797.

Sexually violent predators must register pursuant to the above provisions for their lifetime. *See* 42 Pa.C.S. § 9795.1(b)(3). Although the Act is not explicit on this point, if sexually violent predator status is subsequently terminated, the individual would appear to revert to "offender" status, *see* 42 Pa.C.S. § 9792 (defining "offender"), in which case the total period of registration, determined in accordance with the predicate offense and/or number of convictions, would be either ten years, *see* 42 Pa.C.S. § 9795.1(a)(1) (single conviction of various offenses),[10] or the offender's lifetime. *See* 42 Pa.C.S. § 9795.1(b)(1), (2) (relating to multiple convictions of offenses enumerated in Section 9795.1(a), and conviction of various other offenses, respectively).[11] However, it is not

9. While this provision suggests that subsequent judicial review following an adjudication of sexually violent predator status is not precluded, the Act does not provide any affirmative means of invoking judicial review after the initial adjudication has occurred. Furthermore, the provision in Megan's Law I which provided for such review has been removed. *See* 42 Pa.C.S. § 9794(f) (repealed).

10. The offenses carrying a ten-year registration period for a single conviction are set forth at 18 Pa.C.S. §§ 2901 (relating to kidnapping) where the victim is a minor, 3126 (relating to indecent assault) where the offense is a misdemeanor of the first degree, 4302 (relating to incest) where the victim is between 12 and 17 years of age, 5902(b) (relating to prostitution and related offenses) where the actor promotes the prostitution of a minor, 5903(a)(3)-(6) (relating to obscene and other sexual materials and performances) where the victim is a minor, 6312 (relating to sexual abuse of children), 6318 (relating to unlawful contact with a minor), and 6320 (relating to sexual exploitation of children). *See* 42 Pa.C.S. § 9795.1(a)(1). Individuals convicted of attempting to commit any of the above offenses or any of the offenses listed under subsection (b)(2), *see infra* note 11, are also subject to a ten-year registration period. *See* 42 Pa.C.S. § 9795.1(a)(2).

11. The offenses that invoke a lifetime registration period for a single conviction are those set forth at 18 Pa.C.S. §§ 3121 (relating to rape), 3123 (relating to involuntary deviate sexual intercourse), 3124.1 (relating to sexual assault), 3125 (relating to aggravated indecent assault),

clear from the Act itself—and the parties have not addressed the question—whether any mechanism exists under Pennsylvania law for invoking such subsequent review, *see supra* note 9; nonetheless, for reasons discussed *infra,* the presence or absence of any such mechanism does not alter the disposition of these appeals.

In addition to registration upon release from prison and upon changes of address, sexually violent predators must periodically verify their address with the state police. To accomplish this, the state police send a verification form once every three months to the last residence reported. Upon receipt of this form, the sexually violent predator must appear within ten days at any state police station to submit the completed form and be photographed.[12] The Act also requires a sexually violent predator to attend "at least monthly" counseling sessions in a program approved by the Board, and to pay all fees assessed from such sessions, unless he cannot afford them, in which case they are paid by the parole office. *See* 42 Pa.C.S. § 9799.4. The Board monitors compliance with this requirement, *see id.;* the sexually violent predator must also verify such compliance with the state police as part of the quarterly verification process discussed above. *See* 42 Pa.C.S. § 9796(a).

Since *Williams I* was decided, the United States Supreme Court has clarified that any judicial finding which results in punishment beyond the statutory maximum must be submitted to a jury and proven beyond a reasonable doubt. *See Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 2362–63, 147 L.Ed.2d 435 (2000). Because a determination of sexually violent predator status pursuant to Megan's Law II is submitted to a judge and may be established by a lesser degree of proof, *see* 42 Pa.C.S. § 9795.4(e)(3) (clear and convincing evidence standard), it cannot surmount *Apprendi* if

and 4302 (relating to incest) when the victim is under twelve years of age. *See* 42 Pa.C.S. § 9795.1(b)(2).

12. The Act does not specify the particular information that this form must request. Clearly, however, it should not solicit information beyond that which is necessary for verification purposes as provided in Section 9796, 42 Pa.C.S. § 9796.

such finding results in further criminal punishment. Thus, the central issue in these appeals is whether the registration, notification, and counseling provisions of the Act, applicable to persons deemed sexually violent predators, constitute criminal punishment.

The trial court answered in the affirmative. Initially, the court determined that the General Assembly's subjective purpose in passing Megan's Law II was to enhance community protection, and not to punish sexually violent predators. In reaching this conclusion, the court relied upon the Legislature's declaration of policy, which states:

> It is hereby declared to be the intention of the General Assembly to protect the safety and general welfare of the people of this Commonwealth by providing for registration and community notification regarding sexually violent predators who are about to be released from custody and will live in or near their neighborhood. It is further declared to be the policy of this Commonwealth to require the exchange of relevant information about sexually violent predators among public agencies and officials and to authorize the release of necessary and relevant information about sexually violent predators to members of the general public as a means of assuring public protection and shall not be construed as punitive.

42 Pa.C.S. § 9791(b). As this Court had previously interpreted this identical provision as providing a sufficient basis on which to conclude that the Legislature did not act from a retributive motive in enacting Megan's Law I, *see Commonwealth v. Gaffney*, 557 Pa. 327, 333, 733 A.2d 616, 619 (1999), the trial court concluded that the legislative purpose underlying Megan's Law II was remedial as well. *See* Trial Court op. at 7.

The trial court, however, ultimately determined that, in spite of the General Assembly's intentions related to community protection, the terms of the registration, notification, and counseling requirements are so burdensome upon the sexually violent predator that, as an objective matter, they rise to the level of punishment. In this regard, the court was particularly

troubled by the fact that, unlike Megan's Law I, the Act does not limit dissemination of registration information to the geographic region in which the sexually violent predator lives, but mandates that such information be available upon request to the general public, and allows it to be provided "by electronic means." 42 Pa.C.S. § 9798(d). The court indicated that this gives the police authority to proliferate information about a sexually violent predator by means of the Internet, thus making it available to remote individuals who are situated "outside the zone of any risk." Trial Court op. at 9. The trial court continued:

> This Court must strain to envision a legitimate state interest and need for the wide, uncontrollable dissemination of the stigmatizing fact Petitioner is an SVP [sexually violent predator], that the Act now requires. For instance, there is no need for someone in California to know the personal information of an SVP living in the state of Pennsylvania. The likelihood of someone from another state having any contact with an SVP from Pennsylvania, is remote at best. Yet notification by electronic means is sweeping, overly broad and adversely affects those involved.

Trial Court op. at 9–10.

The trial court also found significant that the Act provides for the possibility of a life sentence for failure to comply with the registration requirements, and likened such provisions to the terms of lifetime probation. Thus, the trial court found that the measures to which an individual adjudicated a sexually violent predator is subjected under the Act are retributive and punitive in nature regardless of legislative intent. That being the case, the full panoply of constitutional rights must be attached to any sexually violent predator adjudication. As the Act fails to provide the necessary safeguards—including the requirement of establishing sexually violent predator status before a jury upon proof beyond a reasonable doubt—the trial court found it unconstitutional. *See* Trial Court op. at 14–15.

Presently, the Commonwealth argues that, in enacting Megan's Law II, the General Assembly corrected the defects in

Megan's Law I, as found by the *Williams I* court. The Commonwealth notes in particular that the Act places the burden of proof upon the Commonwealth rather than the offender, and that any adjudication of sexually violent predator status no longer results in an increased maximum sentence. Rather, a sexually violent predator is subject to additional penalties only if he fails to comply with the periodic registration requirement, which is designated under the Act's enforcement provisions as a separate criminal offense. The Commonwealth also submits that the counseling provisions of Megan's Law II constitute treatment, and thus, are intended to assist the offender, while the registration and notification measures are designed to protect the public. Accordingly, the Commonwealth maintains that the Act is remedial in nature, and therefore, an adjudication of sexually violent predator status need not be made by a jury upon proof beyond a reasonable doubt.

Appellees largely echo the points made by the trial court regarding the increased sanctions that the Act imposes upon sexually violent predators. They assert that the registration, notification, and counseling requirements, in effect, impose additional punishment without first affording an offender adequate due process protections.

## III.

In *Gaffney*, a companion case to *Williams I*, this Court utilized the Third Circuit's "*Artway/Verniero*" test,[13] in hold-

---

**13.** The court in *Artway v. Attorney General of New Jersey*, 81 F.3d 1235 (3d Cir.1996), held that the registration aspects of New Jersey's sex-offender statute did not constitute punishment under the Bill of Attainder Clause, *Ex Post Facto* Clause, or Double Jeopardy Clause. The following year, in *E.B. v. Verniero*, 119 F.3d 1077 (3d Cir.1997), the same court concluded that New Jersey's community notification provision did not inflict criminal punishment in violation of double jeopardy or *ex post facto* principles. Although a different constitutional provision—the Fourteenth Amendment's Due Process Clause—is presently at issue, the question of whether the additional sanctions imposed under Megan's Law II are punitive in nature is the threshold due process inquiry. This was also true of the bill of attainder, double jeopardy, and *ex post facto* claims involved in the pertinent sections of *Artway* and *Verniero*. *See Artway*, 81 F.3d at 1253; *Verniero*, 119 F.3d at 1096.

ing that the registration requirements of Megan's Law I were not penal in nature, and thus, did not violate constitutional *ex post facto* prohibitions. The *Artway/Verniero* standard involves three elements, legislative (subjective) intent, objective intent or purpose, and effects. Under the first element, the court looks to whether the adverse effect upon the individual results from a desire by the Legislature "to punish past conduct or is [instead] a by-product of a bona fide legislative effort to remedy a perceived societal problem." *Verniero*, 119 F.3d at 1093. The second inquiry focuses primarily upon whether analogous measures have been regarded as punishment in the past. Under this prong, the challenged statute will be deemed punitive if any of several conditions is met: (a) the measure's adverse effects cannot be explained solely by its remedial purpose; (b) similar measures have historically been considered punitive; or, (c) if the legislature intended the measure to serve a mixture of deterrent and salutary purposes, the deterrent purpose is an unnecessary complement to, or overwhelms, the measure's salutary operation, or the measure operates in an unusual manner or is inconsistent with its historically mixed purposes. *See Verniero*, 119 F.3d at 1093; *Gaffney*, 557 Pa. at 334, 733 A.2d at 619–20. The final *Artway/Verniero* prong examines whether the "sting of a measure is so harsh as a matter of degree that it constitutes punishment." *Artway*, 81 F.3d at 1266 (internal quotation marks omitted).

This three-level formulation derives from the Third Circuit's synthesis of Supreme Court cases disposing of claims that otherwise civil or remedial legislative measures should be deemed penal for constitutional purposes. While this standard has never been articulated as such by the United States Supreme Court, it substantially overlaps with that Court's traditional two-pronged test, in which the Court first inquires whether the legislature's intent was to impose punishment, and, if not, whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent. *See Allen v. Illinois*, 478 U.S. 364, 368–69, 106 S.Ct. 2988, 2992, 92 L.Ed.2d 296 (1986) (analyzing

state legislation); *United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641, 65 L.Ed.2d 742 (1980) (analyzing federal legislation). To make this latter determination, the Supreme Court has used a multi-factored balancing analysis, *see Ward,* 448 U.S. at 249, 100 S.Ct. at 2641–42, involving several considerations that were first enumerated in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (the *"Mendoza–Martinez* factors"). These are discussed in Section B, *infra.*

■ At the time *Williams I* and *Gaffney* were decided, the Supreme Court had not reviewed any matter in which Megan's Law legislation was challenged as unconstitutionally punitive. Thus, utilization of the *Artway/Verniero* construct comported with this Court's practice of looking to the Third Circuit for guidance regarding the appropriate method of analyzing federal constitutional issues on which the United States Supreme Court had not spoken. *See Commonwealth v. Travaglia,* 541 Pa. 108, 130 n. 15, 661 A.2d 352, 363 n. 15 (1995). Since that time, however, the Supreme Court announced its decision in *Smith v. Doe I,* 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), in which it utilized its traditional two-level inquiry (including the *Mendoza–Martinez* factors) to determine that Alaska's version of Megan's Law is non-punitive. *See id.* at 538 U.S. 90–93, 123 S.Ct. at 1146–47. Accordingly, the proper means of disposing of the present matter is pursuant to the United States Supreme Court's two-level formulation recited above.

## A. Legislative Intent

■ In applying the first element of this test, the sole question is whether the General Assembly's intent was to punish. From the statute's own statement of purpose (*see* 42 Pa.C.S. § 9791(b), recited above), it is evident that the legislative intent underlying the challenged provisions is to identify potential recidivists and avoid recidivism by providing awareness of particular risks to members of the public and treatment to offenders.[14] Indeed, in *Gaffney* this Court found the

14. The codified legislative findings also support this assessment:

identical declaration of policy to constitute a sufficient basis upon which to conclude that the statute there at issue satisfied the legislative intent prong of *Artway/Verniero*. The Court indicated:

> It is clear from the foregoing passage [42 Pa.C.S. § 9791(b)] that the legislature's intent in requiring offenders to register with the State Police regarding their whereabouts was not retribution; rather, the legislature's stated intent was to provide a system of registration and notification so that relevant information would be available to state and local law enforcement officials in order to protect the safety and general welfare of the public. Thus, the legislature's actual purpose in enacting the registration provisions was not punishment; rather its purpose was to effectuate, through remedial legislation, the non-punitive goal of public safety.

*Gaffney*, 557 Pa. at 333, 733 A.2d at 619. Accordingly, as the Act's declaration of policy is the same as that in Megan's Law

> It is hereby determined and declared as a matter of legislative finding: (1) If the public is provided adequate notice and information about sexually violent predators and certain other offenders, the community can develop constructive plans to prepare themselves and their children for the offender's release. This allows communities to meet with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to provide education and counseling to their children. (2) These sexually violent predators pose a high risk of engaging in further offenses even after being released from incarceration or commitments and that protection of the public from this type of offender is a paramount governmental interest. (3) The penal and mental health components of our justice system are largely hidden from public view and lack of information from either may result in failure of both systems to meet this paramount concern of public safety. (4) Overly restrictive confidentiality and liability laws governing the release of information about sexually violent predators have reduced the willingness to release information that could be appropriately released under the public disclosure laws and have increased risks to public safety. (5) Persons found to have committed such an offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government. (6) Release of information about sexually violent predators to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.
>
> 42 Pa.C.S. § 9791(a).

I, and the challenged amendments to the statute are consistent with the above-stated objectives, we conclude that the General Assembly's intent in enacting Megan's Law II was not to punish, but to promote public safety through a civil, regulatory scheme.

## B. Purpose and Effect

■ Having found that the General Assembly intended the law to be civil and remedial rather than punitive, the second stage of analysis involves examining the factors identified by the Supreme Court in its seminal *Mendoza–Martinez* decision. Although "neither exhaustive nor dispositive," this list of factors has proved helpful in considering whether a civil, remedial mechanism "nevertheless provide[s] for sanctions so punitive as to transform what was clearly intended as a civil remedy into a criminal penalty." *United States v. Ward,* 448 U.S. at 249, 100 S.Ct. at 2641 (internal quotation marks omitted); *see Smith,* 538 U.S. at 92, 123 S.Ct. at 1147; *Commonwealth v. McGee,* 560 Pa. 324, 329, 744 A.2d 754, 757 (2000) (stating that the *Mendoza–Martinez* factors are "useful guideposts" in determining whether prison disciplinary confinement constitutes criminal punishment); *Commonwealth v. Wingait Farms,* 547 Pa. 332, 340–41, 690 A.2d 222, 226 (1997) (applying *Mendoza–Martinez* factors in deeming civil forfeitures non-punitive). The *Mendoza–Martinez* Court identified the following considerations: (1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment—retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) whether it appears excessive in relation to the alternative purpose assigned. *See id.* at 168–69, 83 S.Ct. at 567–68.

■ In applying these factors, the Supreme Court has stated that only the "clearest proof" that a law is punitive in effect may overcome a legislative categorization to the con-

trary. *See, e.g., Seling v. Young,* 531 U.S. 250, 261, 121 S.Ct. 727, 734, 148 L.Ed.2d 734 (2001); *Hudson v. United States,* 522 U.S. 93, 100, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997); *Kansas v. Hendricks,* 521 U.S. 346, 361, 117 S.Ct. 2072, 2082, 138 L.Ed.2d 501 (1997); *accord Wingait Farms,* 547 Pa. at 339 n. 5, 690 A.2d at 226 n. 5. While a precise definition of what constitutes the "clearest proof" is rarely articulated, such requirement mirrors the general presumption of validity enjoyed in Pennsylvania by all lawfully enacted legislation. *See Commonwealth v. Stern,* 549 Pa. 505, 512, 701 A.2d 568, 571 (1997). Thus, for present purposes we understand the "clearest proof" standard to indicate that the *Mendoza–Martinez* factors must weigh heavily in favor of a finding of punitive purpose or effect in order to negate the General Assembly's intention that the Act be deemed civil and remedial.

■ With this in mind, we proceed to an examination of the challenged provisions of Megan's Law II using the *Mendoza–Martinez* factors. The following analysis pertains to the Act's registration, notification, and counseling requirements, which we ultimately conclude to be non-punitive, as the contrary has not been demonstrated by the requisite degree of proof. As a separate matter, the Act enforces these measures with penalty provisions which we conclude are constitutionally infirm, but severable. These latter provisions are discussed in Section C, *infra.*

### (1) Affirmative disability or restraint

First, the sanctions imposed here do not involve an "affirmative disability or restraint." Public registration and notification, as mandated by the Act, do not significantly restrain registrants, who remain "free to live where they choose, come and go as they please, and seek whatever employment they may desire." *Femedeer v. Haun,* 227 F.3d 1244, 1250 (10th Cir.2000) (upholding Utah's sex offender registration and notification statute); *accord Smith,* 538 U.S. at 101, 123 S.Ct. at 1151; *Cutshall v. Sundquist,* 193 F.3d 466, 474–75 (6th Cir. 1999) (concluding that public notification under Tennessee's sex offender act "imposes no restraint whatever upon the

activities of a registrant"); *State v. Ward*, 123 Wash.2d 488, 869 P.2d 1062, 1069 (1994) (same); *State v. Noble*, 171 Ariz. 171, 829 P.2d 1217, 1222 (1992) (same). Such liberty is, of course, tempered by the reality that registrants deemed sexually violent predators may, as a consequence of public notification, be foreclosed from certain employment positions, particularly those working with children. But any such restriction is in direct furtherance of the government's compelling interest in keeping sexually violent predators away from children to the extent possible.

The conclusion that the provisions here at issue do not work an affirmative disability is buttressed by the fact that the source cases cited by *Mendoza–Martinez* in support of this factor each involved a statute imposing a deprivation or restraint upon the individual directly, rather than through a secondary effect. *See Mendoza–Martinez*, 372 U.S. at 168 n. 22, 83 S.Ct. at 567 n. 22 (citing *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960) (termination of social security benefits of aliens deported on specific grounds); *United States v. Lovett*, 328 U.S. 303, 316, 106 Ct.Cl. 856, 66 S.Ct. 1073, 1079, 90 L.Ed. 1252 (1946) (prohibition on payment of salaries of certain government employees charged with "subversive" beliefs and associations); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 18 L.Ed. 366 (1866) (exclusion from federal bar for having borne arms against the United States)). Here, by contrast, any disabilities imposed upon sexually violent predators flow solely from the secondary effects of registration and notification, and thus, constitute a potential collateral restraint. *Cf. State v. Ward*, 869 P.2d at 1075–76 (concluding that a criminal defendant need not be informed of "collateral" consequences of his guilty plea, including the requirement that he register as a sex offender after release from prison). Such secondary effects, therefore, do not fall within the same category as incarceration or deprivation of citizenship as they are not imposed directly by the state. *See Herbert v. Billy*, 160 F.3d 1131, 1137 (6th Cir.1998) (indicating that an affirmative disability or restraint "is some sanction approaching the infamous punishment of imprison-

ment" (citation and quotation omitted)); *Cutshall,* 193 F.3d at 474 (concluding that sex-offender registration requirements do not impose an affirmative disability or restraint, in view of more restrictive measures having previously been deemed non-restraining by the Sixth Circuit and the United States Supreme Court); *cf. Hudson,* 522 U.S. at 104, 118 S.Ct. at 496 ("[T]he sanctions imposed do not involve an 'affirmative disability or restraint,' as that term is normally understood; [w]hile petitioners have been prohibited from further participating in the banking industry, this is certainly nothing approaching the infamous punishment of imprisonment." (citation and quotation omitted)).

Nor can Appellees' required attendance at monthly counseling sessions be compared to incarceration or deprivation of citizenship, or even to the liberty-restricting conditions of probation. *See* 42 Pa.C.S. § 9754(c).[15] Certainly, it is not evident, nor is there the "clearest proof," that the counseling requirement is so onerous as to constitute an affirmative disability or restraint, particularly as it is designed, as the Attorney General notes, to "assist[ ] the sexually violent predator, who is likely to be impulsive, irresponsible and burdened with poor behavioral controls, from relapsing into sexually predatory behavior." Thus, because the challenged provisions do not impose an affirmative disability or re-

---

**15.** Appellees contend that the measures at issue result in an effective term of probation. This position fails to note that a sentence of probation often carries with it conditions imposing substantially greater *restraints upon liberty than those involved here.* For example, a probationer may be required to: remain at home during the hours designated by the court; remain within the court's jurisdiction or in a psychiatric institution indefinitely; undergo medical treatment; perform community service; make restitution or reparations; refrain from frequenting certain locations and/or associating with particular individuals; permit the probation officer to visit his home frequently; devote himself to a specific occupation; and/or satisfy a variety of other conditions that the court deems necessary. *See* 42 Pa.C.S. § 9754(c). None of these restraints is applicable to sexually violent predators under Megan's Law II. Notably, as well, the Fourth Amendment affords less protection against warrantless searches of a probationer's residence than similar searches relative to the public at large. *See Griffin v. Wisconsin,* 483 U.S. 868, 875, 107 S.Ct. 3164, 3169, 97 L.Ed.2d 709 (1987).

straint, as that term has been understood, this factor weighs against finding that the statutory scheme is punitive in its purpose or effects.

## (2) Historical treatment

In considering history, we are aided by the treatment given New Jersey's community notification provisions in the majority and dissenting opinions of the Third Circuit's *Verniero* decision. *See Verniero,* 119 F.3d at 1097–1101 (concluding that New Jersey's statute's objective purpose is remedial); *id.* at 1115–22 (Becker, J., concurring and dissenting) (opining that the statute's objective purpose is to punish). The *Verniero* panel majority rejected the appellants' proffered analogies to the punishments of public shaming, humiliation, and banishment as those practices were employed in colonial times, and cited instead to *United States v. Criden,* 648 F.2d 814 (3d Cir.1981), in which the court approved post-trial rebroadcast by the media of video and audio tapes played to the jury during a criminal trial. The *Criden* court had concluded that, although widespread publicity concerning a crime could adversely affect the accused or his relatives, such side effects were an inevitable consequence of public disclosure of accurate criminal information, which is highly valued by our society. Thus, the *Criden* panel explicitly rejected the district court's attempt to analogize rebroadcast to holding the defendant up to public ridicule by placing him in a cage or in stocks. *See id.* at 824–25. The *Verniero* majority then reasoned that, likewise, dissemination of accurate public record information regarding criminal histories has never been regarded as punitive. In this regard, the majority observed that governmental compilation and distribution of what it termed "rap sheet" information, to regulatory agencies, prospective employers, and interested members of the public, "constitute far more compelling analogies than the stocks, cages, and scarlet letters referenced by appellants." *Verniero,* 119 F.3d at 1100. The panel majority ultimately determined that governmental warnings of threats to public safety which are designed to allow members of the public to take steps to protect themselves— such as wanted posters, warning posters regarding escaped

prisoners, and quarantine notices concerning individuals with infectious diseases—offered a closer analogy to sex-offender public notice provisions, which also reflect a governmental purpose to alert the public to a risk of harm, and that the negative effects of such measures have not historically been regarded as punishment. *See id.* at 1101.

The *Verniero* dissent criticized the majority's reliance upon *Criden,* pointing out that that case involved private actors seeking to publicly distribute the criminal information at issue, whereas in Megan's Law governmental authorities are appointed to the task. The dissent viewed this public/private distinction as controlling, *see id.* at 1115 (Becker, C.J., dissenting), and, unlike the majority, opined that "shaming" punishments, because they were carried out by the authorities, did indeed provide an apt analogy to public notification under Megan's Law, particularly as those punishments, like Megan's Law notification, served to warn the community that the individual might re-offend. The dissent, moreover, was unconvinced by the majority's comparisons to warning/wanted posters and quarantine notices, observing that such measures involve no judicial endorsement by a disinterested magistrate, but rather, proceed from "other public agencies," *id.* at 1117, and are more limited in the scope of information revealed. *See id.* at 1118. Additionally, the dissent noted that the type of information subject to public disclosure under Megan's Law—including the offender's identity, description, address, and place of employment—is effectively the same as that which was disseminated in colonial public shaming punishments, inasmuch as the offender in colonial times would have been known to those who witnessed the shaming.

There is certainly validity to the dissent's critique of the *Verniero* majority's analogies to warning/wanted posters and quarantine notices. Such notices are intended to facilitate capture or quarantine of the persons involved, and hence, they do not threaten to disrupt an individual's right to quietly live his life in the midst of his community.[16] Still, it is not clear

---

16. The dissent also observed that quarantine notices do not link the individual with blameworthy conduct. *See id.* at 1118.

that Megan's Law notification is analogous to shaming punishments either, as such measures were directly aimed at stigmatizing offenders. The fact that the offender in colonial times would have been known to his community, as the *Verniero* dissent pointed out, supports the position that such punishments were carried out primarily with a punitive intent. By contrast, the disclosure of factual information concerning the local presence of a potentially harmful individual is aimed, not at stigmatizing that individual, but at allowing potentially vulnerable members of the public to avoid being victimized.

The critical issue for our present purposes is that, even to the extent that notification under Megan's Law II may have some punitive effect in terms of shaming the sex offender, such effect has not been demonstrated to be sufficient in itself to render the challenged measures criminal punishment for constitutional purposes. For one thing, "whether a sanction constitutes punishment is not determined from the defendant's perspective, as even remedial sanctions carry the sting of punishment." *Department of Revenue of Montana v. Kurth Ranch,* 511 U.S. 767, 777 n. 14, 114 S.Ct. 1937, 1945 n. 14, 128 L.Ed.2d 767 (1994). Equally important, any punitive effect that results from being designated a sexually violent predator is not gratuitous, but rather, an inevitable consequence of the effectuation of the law's remedial objective of protecting vulnerable members of the public. *See United States v. Salerno,* 481 U.S. 739, 747, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) ("Unless Congress expressly intended to impose punitive restrictions, the punitive/regulatory distinction turns on whether an alternative purpose to which the restriction may rationally be connected is assignable for it, and whether it appears excessive in relation to [such] purpose." (internal quotation marks omitted)). Thus, unlike shaming punishments such as stocks and cages—where there would have been alternative means of notifying the community that a certain individual had committed a particular crime—the notification provisions of Megan's Law appear to be reasonably calculated to accomplish self-protection only, and not to impose additional opprobrium upon the offender unrelated to that goal. *See Poritz,* 662 A.2d

at 372 (concluding that "the Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose and only for that purpose, and not designed to punish"); *Roe v. Office of Adult Probation,* 125 F.3d 47, 55 (2d Cir.1997) ("Modern day community notification measures serve vastly different purposes than those served by [traditional stigmatization penalties or banishment], operate without the physical participation of the offender, and lack the general social significance accompanying traditional shaming and banishment penalties."); *see also Smith,* 538 U.S. at 99, 123 S.Ct. at 1150 (rejecting any analogy to colonial shaming punishments, and noting that in "[i]n contrast to [such punishments], the State does not make publicity and the resulting stigma an integral part of the objective of the regulatory scheme").

The counseling requirement likewise does not implicate traditional methods of punishment. The trial court observed that mandatory, periodic counseling may be a condition of supervision incident to probation or parole, *see* Trial Court op. at 11, and Appellees presently note that probation has historically been a form of punishment. It does not follow, however, that the counseling requirement under Megan's Law II is historically analogous to punishment. Primarily, counseling does not serve punitive ends notwithstanding its use as a condition of probation or parole. While probation itself may be a form of punishment, probation conditions are imposed specifically to "insure or assist the defendant in leading a law-abiding life." 42 Pa.C.S. § 9754(b); *see also Commonwealth v. Quinlan,* 488 Pa. 255, 258, 412 A.2d 494, 496 (1980) (stating that parole and probation "are primarily concerned with the rehabilitation and restoration to a useful life of the parolee or probationer"); *Commonwealth v. Kates,* 452 Pa. 102, 115, 305 A.2d 701, 708 (1973) (observing that "the basic objective of probation is to provide a means to achieve rehabilitation without resorting to incarceration"). Indeed, counseling, by its very nature, is rehabilitative and not retributive. This is significant because the requisite historical analysis focuses

upon whether the provision itself has traditionally been regarded as punishment, not whether it is an incident of other measures historically associated with criminal punishment. *See Gaffney*, 557 Pa. at 334, 733 A.2d at 619; *Artway*, 81 F.3d at 1263. Therefore, this factor supports a conclusion that the Act is non-punitive.

### (3) Finding of scienter

Under the statute, registration, notification, and counseling apply to individuals adjudicated to be sexually violent predators. The determination of an individual's status as such is only undertaken if the individual is convicted of a predicate offense. In this respect, the Act differs from the civil commitment statute at issue in *Hendricks*, under which a person could be deemed a sexually violent predator even if he had been acquitted by reason of insanity or found incompetent to stand trial. *See Hendricks*, 521 U.S. at 352, 117 S.Ct. at 2077. Still, not all of Megan's Law II's predicate offenses require a finding of scienter for conviction; some can be committed whether or not the defendant is aware of certain facts that make his conduct criminal. For example, a defendant who creates a visual record or depiction of sexual acts by a minor child can be convicted of sexual abuse of children pursuant to Section 6312(b) of the Crimes Code, *see* 18 Pa.C.S. § 6312(b), even where he has a good faith belief that the child is over eighteen years of age. *See* 18 Pa.C.S. § 6312(e.1). The Act's provisions, then, do not become applicable only upon a finding of scienter, thus supporting the conclusion that Megan's Law II is non-punitive pursuant to this *Mendoza–Martinez* factor. *Accord Doe I v. Otte*, 259 F.3d 979, 989 (9th Cir.2001), *rev'd on other grounds sub nom Smith v. Doe I*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003). It significant as well that, when considering the question of whether civil commitment could be imposed only upon a finding of scienter, the *Hendricks* court did not premise its negative answer upon the possibility that commitment could follow an acquittal. It observed, rather, that "the commitment determination is made based on a 'mental abnormality' or 'personality disorder' rather than one's criminal intent." *Id.* at 362, 117 S.Ct. at 2082. Here, the

relevant determination of sexually violent predator status is likewise made based upon a mental abnormality, thus bolstering the conclusion that the provisions do not "come into play" only upon a finding of scienter for purposes of *Mendoza–Martinez.*

### (4) Traditional aims of punishment

Subjection to the registration and counseling requirements, like civil commitment in *Hendricks,* does not operate primarily to deter, or exact retribution for, blameworthy conduct. Given the substantial period of incarceration attached to the predicate offense, it is unlikely that the prospect of subsequent registration, notification, and counseling will have any marginal deterrent effect upon a sexually violent predator. *See Hendricks,* 521 U.S. at 362, 117 S.Ct. at 2082 (observing that a person suffering from a mental abnormality or personality disorder that prevents him from exercising adequate control over his behavior is not likely to be deterred, even by the threat of confinement). Although registration and notification may curtail opportunities to commit future sex offenses, these measures primarily protect innocent persons from victimization by permitting such persons to alter their own behavior according to the risks posed. *Accord Roe,* 125 F.3d at 55. Nor are the measures at issue primarily retributive, as they do not require the individual to "pay his debt to society," *Williams v. Illinois,* 399 U.S. 235, 261, 90 S.Ct. 2018, 2032, 26 L.Ed.2d 586 (1970) (Harlan, J., concurring), through the imposition of fines, restitution, or confinement. *See generally* BLACK'S LAW DICTIONARY 1318 (7th ed. 1999) (defining retribution in terms of repayment or revenge for the offense committed); *In re Murphy,* 127 Vt. 198, 243 A.2d 788, 789 (1968) (recognizing that retribution subsumes the concept of payment for damage done). Any retributive effect of the challenged provisions, therefore, is ancillary to the results achieved in terms of societal awareness and self-protection, and rehabilitation of the offender.[17] Accordingly, this factor also weighs in favor of finding the Act non-punitive.

17. Here we are assuming that the legislative findings set forth above, *see supra* note 14, are substantially valid. Since the common pleas

*(5) Application to criminal behavior*

To the extent that the determination of sexually violent predator status is made based upon, not criminal activity, but a finding of a mental abnormality or personality disorder, it is not applied to conduct at all, but to an individual's status as suffering from a serious psychological defect. While it must be acknowledged that the procedures whereby an individual is potentially subjected to registration, notification, and counseling are triggered only after conviction of a predicate offense, *see* 42 Pa.C.S. § 9795.4, the United States Supreme Court has concluded that this is of little significance in evaluating whether or not Megan's Law legislation is punitive; the Court explained in *Smith* that, where such legislation is concerned, application to past criminal conduct is "a necessary beginning point, for recidivism is the statutory concern." *Smith*, 538 U.S. at 105, 123 S.Ct. at 1154; *cf. State v. Ulesky*, 54 N.J. 26, 252 A.2d 720, 722 (1969) *(per curiam)* (suggesting that municipal registration of criminals is prophylactic, not punitive). Thus, the Supreme Court disagreed with the Ninth Circuit's conclusion that the fact that Alaska's statute "applies only to behavior that is already criminal [supports] the conclusion that its effect is punitive." *Otte*, 259 F.3d at 991. This factor, then, does not support a finding that Megan's Law II imposes criminal punishment.

*(6) Non-punitive purpose*

"The Act's rational connection to a nonpunitive purpose is a '[m]ost significant' factor in our determination that the statute's effects are not punitive." *Smith*, 538 U.S. at 102, 123 S.Ct. at 1152 (quoting *United States v. Ursery*, 518 U.S. 267, 290, 116 S.Ct. 2135, 2148, 135 L.Ed.2d 549 (1996)). Here, the legislative findings "are consistent with grave concerns over the high rate of recidivism among convicted sex offenders." *Smith*, 538 U.S. at 103, 123 S.Ct. at 1153. This Court has already determined that registration is regulatory and remedi-

court upheld Appellees' challenge to Megan's Law II without a hearing, at this juncture there is nothing of record to bring such findings into dispute, nor has there been factfinding in this regard.

al, not punitive. *See Gaffney*, 557 Pa. at 339, 733 A.2d at 622. Notification and counseling can also be explained by reference solely to remedial objectives. As to notification in particular, while anyone may take certain steps to avoid victimization by a sex offender, reason dictates that awareness that a particular sexual predator lives near a home or school frequented by children will make a practical difference in avoiding predation. In this regard, it is significant that most of the notification provisions pertain to neighbors of a sexually violent predator, social service agencies, schools, or day care centers. *See* 42 Pa.C.S. § 9798(b). The recipients under these provisions all have an interest in protecting the children or students under their care. So long as the state must prove its case by clear and convincing evidence, such community notification provisions have withstood constitutional scrutiny. *See, e.g., Verniero*, 119 F.3d at 1111; *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367, 406 (1995) (concluding that New Jersey's Megan's Law's registration and notification requirements are not punitive).

Additionally, as noted in the historical analysis section above, the registration, notification, and counseling procedures do not appear designed to impose upon the sexually violent predator any gratuitous opprobrium or hardship beyond what is reasonably necessary to effectuate the Legislature's remedial and regulatory purposes.[18] Indeed, it appears that the crux of the issue with regard to public notification stems from Section 9798(d), which provides:

18. Sexually violent predators are generally responsible, under the Act, to pay for the mandatory counseling sessions. *See* 42 Pa.C.S. § 9799.4. To the extent Appellees argue that the Act is punitive due to the imposition of such costs, we note that, although the monetary liability may appear somewhat burdensome, the record is silent regarding the amount of the fees involved, and, moreover, an explanation apart from a desire to punish is readily available. In particular, the General Assembly could reasonably be expected to resist expending public funds on this aspect of the offender's rehabilitation. It should be noted, as well, that if an offender cannot afford the fees, counseling is provided free of charge. *See* 42 Pa.C.S. § 9799.4. In the context of the Act, moreover, it would appear that the intent of the counseling requirement is to help both the offender and the community in which he lives by reducing the likelihood of recidivism.

**(d) Public notice.**—All information provided in accordance with subsection (a) shall be available, upon request, to the general public. The information may be provided by electronic means.

42 Pa.C.S. § 9798(d).

It is contended that this section is a mandate for wide dissemination of the stigmatizing fact that an individual is a sexually violent predator, and that no legitimate state interest exists for providing notification of sexually violent predator status to persons in other states who are unlikely to encounter the individual. This contention appears based upon the prospect that the state could choose to display a registrant's information on the Internet, where it would be viewable by anyone, anywhere in the world with Internet access. Such interpretation, however, is unwarranted by the statutory text. Although the information is made available to the general public, by the terms of the statute it is provided only "upon request." Hence, the most natural interpretation of this provision is that, if any member of the public specifically requests the information, it will be made available to that person. Notably, much of the data involved is a matter of public record. *See* 42 Pa.C.S. § 9798(a) (specifying the registration information subject to disclosure). It is difficult to see how disseminating it to a member of the public upon specific request is constitutionally problematic, particularly in light of the legislative findings and in the absence of evidence and judicial findings to the contrary. Moreover, because the data is made available primarily for the benefit of those having an interest in guarding themselves, or those under their care, against a risk of predation, any additional disclosure should be regarded as ancillary to the main remedial purpose sought to be accomplished by community notification.

█ The provision allowing for dissemination of the requested information by "electronic means," 42 Pa.C.S. § 9798(d), has raised similar concerns. However, this provision need not be read to authorize public display of the information, as on the Internet. In context, it merely indicates that, once a specific request is lodged, compliance can be

accomplished electronically. It is thus unlike New Jersey's statute which specifically authorizes dissemination of sex offender information to the public over the Internet. *See* N.J. STAT. ANN. §§ 2C:7–12–2C:7–14. Accordingly, we construe the section at issue as only authorizing electronic transmission (for example, by email or fax machine) to an individual who lodges a specific request for the data, and not electronic display of the data to the general public.

We also disagree with the position that the state has no valid reason to transmit data concerning sexually violent predators to persons located outside of Pennsylvania. There would appear to be a legitimate governmental interest, for example, in informing individuals who are planning to move to the Commonwealth of the presence of a sexually violent predator residing in their prospective neighborhood. Similarly, it would be reasonable for organizations providing educational, athletic, or other services to minors, to conduct thorough background checks of prospective employees. All jurisdictions, including Pennsylvania, would thus appear to have a valid interest in providing, upon request, any information that exists concerning such prospective employee's history of convictions for relevant offenses, whether or not the request emanates from within or outside the Commonwealth. *Cf.* 42 U.S.C. § 14071(b)(2)(B) (requiring States, under the federal Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Program, to transmit sex offender registration information to a national database). In short, the provision allowing for dissemination of sexually violent predator information to individual members of the public, upon request, appears to be a reasonable means chosen by the Legislature to serve the legitimate governmental interest in providing persons who may be affected by the presence of a sexually violent predator with the information they need to protect themselves or those under their care against predation by "tak[ing] the common-sense steps that might prevent such an occurrence." *Poritz*, 662 A.2d at 373. Accordingly, the community notification provisions of the statute are fully explainable without resort to theories of retribution or deter-

rence, the "traditional aims of punishment." *Hudson,* 522 U.S. at 99, 118 S.Ct. at 493. Hence, this factor does support a conclusion that the Act's purpose or effect is punitive.

### (7) Excessiveness

In general, and with due deference to the legislative findings and recognition of the present state of the record, measures requiring registration, notification, and counseling appear reasonably designed to serve the government's legitimate goal of enhancing public awareness and ensuring that offenders do not relapse into harmful behavior. Counseling serves the rehabilitative and prophylactic purposes subsumed by that goal, and the registration/notification measures appear calculated to advance appropriate public awareness. In this regard, it has been noted that "Congress, and the legislatures of the several states, have considered the egregiousness of sexual crimes, particularly where children are concerned, and studies have indicated that sexual offenders have high rates of recidivism." *Cutshall,* 193 F.3d at 476; *see also McKune v. Lile,* 536 U.S. 24, 34, 122 S.Ct. 2017, 2024, 153 L.Ed.2d 47 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."), *quoted in Smith,* 538 U.S. at 103, 123 S.Ct. at 1153. Thus, although the duty to register with the police and verify one's residence quarterly may seem onerous to the sexually violent predator, the question is whether it is sufficiently so to transform an otherwise remedial statute into a punitive one. *See Doe v. Pataki,* 120 F.3d 1263, 1285 (2d Cir.1997) (reasoning that quarterly in-person registration, while onerous, is non-punitive, inasmuch as the Supreme Court "has consistently upheld far heavier burdens against *ex post facto* challenges, including deportation, termination of financial support, and loss of livelihood"). Concerning this inquiry, the *Artway* court indicated that

> [t]he caselaw does not tell us where the line falls that divides permissible from impermissible effects, but we know the "matter of degree" is somewhere between imprisonment

and revocation of citizenship on the one hand, and loss of a profession or benefits on the other.

*Id.* at 1266 (comparing *Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (increased incarceration constitutes punishment), and *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (citizenship revocation constitutes punishment), with *De Veau v. Braisted*, 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (forbidding work as union official is not punishment), *Hawker v. People of New York*, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revoking one's medical license is not punishment), and *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (terminating social security benefits is not punishment)).

The *Verniero* panel expanded upon these observations by noting that the effects of a measure must be "extremely onerous" to constitute punishment, as even the deprivation of one's livelihood does not qualify. *See Verniero*, 119 F.3d at 1101. The court recognized, moreover, that the challenged statute's effects must be evaluated in light of the importance of the governmental interest involved, *accord Nestor*, 363 U.S. at 616, 80 S.Ct. at 1375 ("[E]ach case has turned on its own highly particularized context."); *Artway*, 81 F.3d at 1260 (reasoning that the analysis under the effects prong is "flexible and context-dependent"), and that even denaturalization and incarceration are not punitive in all contexts. *See Verniero*, 119 F.3d at 1101–02 (citing *Trop*, 356 U.S. at 98, 78 S.Ct. at 596–97 (denaturalization as a remedy for citizenship fraudulently obtained is not punishment, but a necessary part of regulating naturalization of aliens)); *see also Salerno*, 481 U.S. at 747, 107 S.Ct. at 2101 (pretrial detention based upon future dangerousness is regulatory, not punitive); *cf. Hendricks*, 521 U.S. at 363, 117 S.Ct. at 2083 (civil confinement of dangerous, mentally ill patients is not punishment). Turning to the challenged provisions of New Jersey's registration and community notification requirements, the panel stated:

> The direct effects of Megan's Law clearly do not rise to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment. All Megan's Law

mandates is registration and notification. Under Megan's Law, New Jersey has not deprived appellants of their freedom or their citizenship. The state has imposed no restrictions on a registrant's ability to live and work in a community, to move from place to place, to obtain a professional license or to secure governmental benefits.

\* \* \* \* \* \*

*Hendricks,* and the long line of cases on which it relies, counsels that bona fide remedial legislation may inflict very substantial individual hardship without [constituting punishment]. It necessarily follows that some limit must be placed on the situations in which a measure's sting alone, despite its remedial purpose and effect, will constitute punishment under [the Ex Post Facto and Double Jeopardy] clauses, and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic.

*Verniero,* 119 F.3d at 1102–03. The court went on to conclude, relying upon *Hendricks,* that the state's interest in protecting the public against sexually violent predators is so great that it justifies the adverse effects that community notification might have upon the registrant. *See id.* at 1104.

■ We agree with *Verniero*'s analysis and conclude that the duties imposed upon the sexually violent predator with regard to registration, verification, and counseling, are not in themselves sufficiently onerous to qualify as punishment based upon alleged excessiveness. *See generally Smith,* 538 U.S. at 105, 123 S.Ct. at 1154 (indicating that the crux of the excessiveness inquiry is not "whether the legislature has made the best choice possible," but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective" sought to be achieved). Still, one of the most troubling aspects of the statute is that the period of registration, notification, and counseling lasts for the sexually violent predator's entire lifetime. A reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke

judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community. This aspect of the statute may be particularly problematic if the definition of "sexually violent predator" is incapable of reasonably precise implementation, as explained below. Notably, however, the position that a means for subsequent judicial review is a necessary feature of any valid registration/notification scheme assumes that, given sufficient time and/or treatment, sexually violent predators can be fully cured of the "mental abnormality or personality disorder [making them] likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9792 (defining "sexually violent predator").[19] As the record is devoid of any information concerning the prospect of successful treatment of such individuals, the presumption of constitutionality enjoyed by all validly enacted legislation, *see Commonwealth v. Means*, 565 Pa. 309, 315, 773 A.2d 143, 147 (2001), remains unrebutted. *Cf. Commonwealth v. Fleming*, 801 A.2d 1234, 1240–41 (Pa.Super.2002) (concluding that Megan's Law II's extension of the registration term for certain offenders from ten years to life did not constitute punishment).

■ Amicus Defender Association of Philadelphia ("Defender Association") additionally maintains that the statute is impermissibly vague, in that it fails to allow for a sufficiently precise understanding of who is or is not a sexually violent predator. As Appellees' void for vagueness challenge was not addressed by the trial court, and the matter will be remanded for consideration of this claim, any imprecision in the Act's provisions must presently be evaluated in terms of whether it renders the statute unconstitutionally punitive through excessiveness. Primarily, if the Act's imprecision is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive in relation to

19. *Cf. Doe v. Poritz,* 662 A.2d at 374–75 & n. 1 (indicating that New Jersey's legislature was entitled to consider evidence that treatment success for predatory sex offenders is low, the tendency of such individuals to recidivate persists over time, and the time span between offenses may be long).

the remedial purposes served. This could be accomplished in multiple ways. For example, Appellees could show that it is not sufficiently clear which predicate offenses are intended to lead to a sexually violent predator assessment in the first instance. Alternatively, Appellees could establish that the offender assessment process is so unreliable that there will be little correlation between those ultimately deemed sexually violent predators and the class of individuals who pose the greatest risk of predation.

The first of these options is foreclosed by the fact that a specific set of predicate offenses is enumerated by the terms of the Act. *See* 42 Pa.C.S. § 9795.1. The latter option is undertaken by the Defender Association, which contends that the basis for any assessment is not scientifically precise. The Board, as amicus in support of the Commonwealth, counters that there is no legally problematic imprecision involved in its assessments, as the existence of a relevant mental abnormality or personality disorder is determined with reference to established diagnostic criteria for recognized sexual dysfunctions. Indeed, the definition of "sexually violent predator" is substantially the same as that contained in the Kansas statute at issue in *Hendricks*, which the Supreme Court determined to be sufficiently precise to be utilized as a prerequisite for civil commitment. *See Hendricks*, 521 U.S. at 360 & n. 3, 117 S.Ct. at 2081 & n. 3.[20] Particularly in light of the additional criteria that the Board is required to utilize in reaching its assessment, *see* 42 Pa.C.S. § 9795.4(b),[21] any conclusion that an

20. The Kansas enactment defines sexually violent predator as "any person who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeated acts of sexual violence." KAN. STAT. § 59–29a02.

21. The Board is required to establish standards for evaluations and for evaluators conducting the assessments, which must include (without limitation) an examination of the following factors:

(1) Facts of the current offense, including: (i) Whether the offense involved multiple victims. (ii) Whether the individual exceeded the means necessary to achieve the offense. (iii) The nature of the sexual contact with the victim. (iv) Relationship of the individual to the victim. (v) Age of the victim. (vi) Whether the offense included a

assessment of sexually violent predator status is so arbitrary that the consequences to the individual so adjudicated constitute punishment, would have to be grounded upon credible record evidence that the enumerated criteria were non-predictive, or that assessment pursuant to them was inherently unreliable.[22] *See generally Schall v. Martin*, 467 U.S. 253, 278–79, 104 S.Ct. 2403, 2417, 81 L.Ed.2d 207 (1984) (indicating that, "from a legal point of view, there is nothing inherently unattainable about a prediction of future criminal conduct[;] [s]uch a judgment forms an important element in many decisions, and we have specifically rejected the contention ... that it is impossible to predict future behavior and that the question is so vague as to be meaningless" (internal footnote and quotation marks omitted)). As no such proof appears of record at this stage in the litigation, we cannot conclude that Appellees have sustained their burden to establish excessiveness by the "clearest proof."

On the present record, then, and in consideration of all of the *Martinez–Mendoza* factors, we find that the trial court should not have invalidated Megan's Law II's registration,

display of unusual cruelty by the individual during the commission of the crime. (vii) The mental capacity of the victim.

(2) Prior offense history, including: (i) The individual's prior criminal record. (ii) Whether the individual completed any prior sentences. (iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including: (i) Age of the individual. (ii) Use of illegal drugs by the individual. (iii) Any mental illness, mental disability or mental abnormality. (iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment filed [sic] as criteria reasonably related to the risk of reoffense.

42 Pa.C.S. § 9795.4(b).

22. Amicus Defender Association argues that *Lanzetta v. New Jersey*, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), compels a finding that any assessment under the Act is unconstitutional. In *Lanzetta*, the Supreme Court struck down a state law which made it a crime to be a "gangster." The legislation thus created a criminal offense based upon certain conduct, but failed to define the prohibited conduct in a sufficiently specific manner. *See id.* at 453, 59 S.Ct. at 619. Megan's Law II, by contrast, does not criminalize any conduct, and, as noted, provides a specific list of offenses that trigger a predator status assessment. *See* 42 Pa.C.S. §§ 9792, 9795.1.

notification, and counseling requirements as unconstitutionally punitive.[23]

## C. Penalty For Non–Compliance

 The Act also contains two distinct, but similar, penalty provisions at issue in this appeal. Initially, the statute provides:

> An individual subject to registration under section 9795.1(b)(1), (2) or (3) who fails to register with the Pennsylvania State Police as required in this section commits a felony of the first degree and shall be sentenced to a mandatory minimum sentence of probation for the remainder of the individual's lifetime and may be sentenced to a period of incarceration of up to the individual's lifetime.

42 Pa.C.S. § 9795.2(d)(2).[24] Individuals deemed sexually violent predators are subject to registration under Section 9795(b)(3), *see* 42 Pa.C.S. § 9795(b)(3), rendering the above penalty clause applicable to them.

There is a similar penalty for failure to verify one's residence as required by the Act:

> An individual subject to registration under section 9795.1(b)(1), (2) or (3) who fails to verify his residence or be photographed as required in this section commits a felony of the first degree and shall be sentenced to a mandatory minimum sentence of probation for the remainder of the individual's lifetime and may be sentenced to a period of incarceration of up to the individual's lifetime.

**23.** Nothing in this opinion should be read to foreclose the proffer of competent evidence on remand on consideration of Appellees' void-for-vagueness challenge, *see infra* note 27, and its implications in terms of the remedial versus punitive dynamics of the statute.

**24.** Section (d)(1) states, "An individual subject to registration under section 9795.1(a) who fails to register with the Pennsylvania State Police as required in this section commits a felony of the third degree." 42 Pa.C.S. § 9795.2(d)(1). Section 9795.1(a), however, does not pertain to sexually violent predators. As this appeal only concerns the Act's mandatory sanctions applicable to sexually violent predators, no challenge to the penalty imposed by Section 9795.2(d)(1) is presently before the Court.

42 Pa.C.S. § 9796(e)(2).[25] Again, as sexually violent predators are subject to registration under Section 9795(b)(3), the above penalty section applies, and the question of its validity is before the Court as to them.

The import of the above provisions is that, any failure to comply with registration and verification procedures, as outlined in the Act, can subject a sexually violent predator to life in prison. While it is understandable that the General Assembly would wish to provide a means of enforcing its registration and address verification scheme, the method it has chosen involves recognized punitive measures (incarceration and probation) that carry a possible lifetime term. As such measures are manifestly in excess of what is needed to ensure compliance, they must be considered punitive, and thus, unconstitutional insofar as they purport to apply to "individual[s] subject to registration under section 9795.1(b)[ ](3)," that is, sexually violent predators.[26]

The Attorney General argues that sexually violent predator status alone cannot lead to a sentence of probation or imprisonment, but that conviction of an independent substantive offense is required—namely, failure to comply with either the lifetime registration requirement, *see* 42 Pa.C.S. § 9795.2(d)(2), or the periodic verification requirement, *see* 42 Pa.C.S. § 9796(e)(2)—and such conviction could only follow a criminal proceeding in which the full panoply of due process protections was afforded. *See* Brief at 13. This argument overlooks the fact that the new substantive offense proceeds directly from the Act's enforcement provisions, and, furthermore, conviction would be a fairly trivial matter. Under Section 9796(e), for example, the Commonwealth would only need to establish that the registrant did not appear at a state

25. Like the first penalty section, this provision has a counterpart, stating, "Any individual subject to registration under section 9795.1(a) who fails to verify his residence or be photographed as required in this section commits a felony of the third degree." 42 Pa.C.S. § 9796(e)(1). Because sexually violent predators are not covered by Section 9795.1(a), no challenge to this provision is before the Court.

26. We offer no opinion regarding the validity of these provisions as pertains to individuals subject to registration under Section 9795.1(b)(1) or (2).

police station within ten days of the date the verification form was sent. Therefore, whatever the intentions of the Legislature in this regard, the purpose and effects of these provisions must be deemed punitive.

 Having concluded that the portions of Sections 9795.2(d)(2) and 9796(e)(2) applicable to sexually violent predators are constitutionally infirm, it remains to determine whether they can be severed from the Act. Although Megan's Law II does not contain a severability provision, unless otherwise specified the individual provisions of all statutes are presumptively severable. *See* 1 Pa.C.S. § 1925. Severance is precluded only where, after the void provisions are excised, the remainder of the statute is incapable of execution in accordance with legislative intent. *See id.* Furthermore, the fact that an unconstitutional provision is found within an otherwise valid section does not preclude its severance. *See Rieck–McJunkin Dairy Co. v. Milk Control Comm'n*, 341 Pa. 153, 162–63, 18 A.2d 868, 872 (1941).

 As noted, the Act's penalty provisions provide an enforcement mechanism for the registration and verification mandates. They do so by erecting an enormous disincentive for failing to comply. Conceptually, however, they constitute an "add-on" to the integrated legislative scheme as set out in the remainder of the statute. Those requirements, and the system under which they operate, form a distinct program. Moreover, even absent the penalty provisions, enforcement is possible. Because registration and verification are statutorily required, the district attorney could implicate the judicial process through an enforcement proceeding in which failure to comply with the resulting order would be punishable by the court's contempt powers. Under these circumstances, it cannot reasonably be contended that the valid provisions of Megan's Law II are so dependent upon the penalty provisions that the General Assembly would not have enacted the former without the latter. *See* 1 Pa.C.S. § 1925. Hence, the penalty clauses are severable.

## D. Conclusion

In the absence of competent and credible evidence undermining the relevant legislative findings, Megan's Law's registration, notification, and counseling provisions constitute non-punitive, regulatory measures supporting a legitimate governmental purpose. Therefore, these measures are presently upheld against Appellees' claim that they result in additional criminal punishment. The prescribed penalties for failure to register and verify one's residence as required are unconstitutionally punitive, but severable. Accordingly, those provisions are invalidated, and the matter is remanded to the trial court for consideration of Appellees' remaining constitutional challenges.[27]

Former Chief Justice ZAPPALA did not participate in the decision of this case.

---

**27.** In addition to claiming that Megan's Law is punitive, Appellees assert that it is void for vagueness and violative of substantive due process guarantees and the separation of powers doctrine. Appellees also maintain that the statute contains more than one subject in contravention of Article III, Section 3 of the Pennsylvania Constitution.