COMMONWEALTH of Pennsylvania, Appellee,

v.

Thomas MULLINS, Appellant.

Superior Court of Pennsylvania.

Submitted March 22, 2006.

Filed Aug. 10, 2006.

---

Christa L. Schott, Public Defender, Doylestown, for appellant.

Robin P. Campbell, Asst. Dist. Atty., Doylestown, for Com, appellee.

BEFORE: TODD, BENDER and GANTMAN, JJ.

OPINION BY BENDER, J.:

¶ 1 Thomas Mullins appeals from the judgment of sentence imposed following his entry of guilty pleas to charges of involuntary deviate sexual intercourse (IDSI), aggravated indecent assault, indecent assault, endangering the welfare of a child, and corruption of minors, in connection with the sexual abuse of his stepdaughter, who was less than thirteen years old at the time the crimes were committed. Pursuant to the provisions in Megan's Law, currently codified at 42 Pa.C.S. §§ 9791–9799.9, Appellant was determined to be a sexually violent predator (SVP), thus subjecting him to the registration, notification, and counseling provisions of that statute for his lifetime. In this appeal, Appellant challenges Megan's Law, in the form it existed at the time of his sentencing (hereinafter "Megan's Law II"), as unconstitutionally excessive and vague, and he challenges the sufficiency of the evidence to support the trial court's determination that he is an SVP. We affirm.

¶ 2 Appearing before the Honorable Mitchell S. Goldberg, Appellant pled guilty to the following facts as recited by the Commonwealth at his guilty plea hearing:

[O]n Wednesday, June 3rd of 2003, at approximately 1 p.m., [Officer Daniel

Jones and Officer Lauren Nelson of the Upper Makefield Township Police Department] received a fax message from CPS social worker Lisa Ann Gardner of the Bucks County Children and Youth reporting that an 11–year–old female had reported that her stepfather, the defendant before you, Thomas Mullins, was sexually abusing her.

Later in that day, at approximately 3:10 p.m., Miss Gardner interviewed [B.C.] in this case, the 11–year–old female, who currently lived with her mother, sister, brother and the defendant. This was at the address on Van Sant Road in New Hope, Bucks County.

She stated that from the spring of 2002, initially, until the present, the defendant had sexually assaulted her at that address approximately 20 times, during that last year.

She stated that prior to moving to Bucks County, she lived in Tampa, Florida, and that the defendant had first sexually assaulted her when she was between first and second grade in Tampa, Florida.

She then stated that he would force her to perform oral sex on him and to manually stimulate his penis with her hand. She stated that each time she had sexual conduct [sic], he would make her take off all of her clothing and he would take off all of his clothing.

[She] stated that at the conclusion of the . . . sexual acts, that the defendant would always ejaculate in a towel which he had handy.

She stated that he would perform these sexual acts on her when her mother was away from the household on business trips.

She stated the defendant would routinely tell her that he had plans, indicating to her that he was going to have sexual contact with her when her mother was gone.

She stated that on at least one encounter, the defendant had rubbed her genitalia, her vagina. In addition, she stated that he tried to place his finger all the way in her vagina, but she stopped him after he had gotten past the labia of her vagina before entirely entering her vagina.

She also stated that on several occasions the defendant forced her to view pornographic movies and that during these movies, the defendant would masturbate and make her watch.

She also stated that in reference to the sexual conduct, the defendant told her, "Every dad and daughter do it. It makes us seem more like a family."

[The victim] stated that two weeks prior to this, when her mother was in Rochester, New York, the defendant forced her to perform oral sex on him.

. . .

She then stated the night before, on June 2, of 2003, the defendant had asked her to perform oral sex on him. She refused and the defendant became angry.

He told her that she shouldn't lead people on and play with their heads when you're in a relationship. After this comment, [the victim] decided to report the sexual conduct.

In addition, she reported to Lisa Gardner that she was concerned for her two-year-old sister, that this would not happen to her as well.

On Wednesday, June 3rd, 2003, at approximately 5 p.m., Lisa Gardner interviewed the defendant Thomas Mullins, where he admitted the allegations as stated in Miss Gardner's testimony.

In summation, during the interview, the defendant admitted that he had an

inappropriate sexual relationship with his daughter. By inappropriate sexual relationship, he meant touching, fondling and oral sex.

He admitted that he performed oral sex on her and that she performed oral sex on him. He had stated to Lisa that this had been going on since [the victim] was in third grade going into fourth grade.

And finally, he admitted that he had the inappropriate sexual contact with [the victim] when his wife was out of town on business.

N.T. Guilty Plea, 11/12/03, at 116–120. Judge Goldberg accepted Appellant's guilty plea to the above-noted sex offenses and ordered a pre-sentence report. Additionally, because these offenses triggered application of Megan's Law II, Judge Goldberg ordered an assessment by the Sexual Offenders Assessment Board (SOAB). *See* 42 Pa.C.S. §§ 9795.1, 9795.4.

¶ 3 On February 9, 2004, the SOAB assessment having been completed, the Commonwealth filed a praecipe, upon which the court scheduled a hearing, for a determination of whether Appellant was a sexually violent predator[1] (SVP) under Megan's Law II. *See* 42 Pa.C.S. § 9795.4(e)(1). At the hearing, held on May 7, 2004, Judge Goldberg heard testimony from both sides—psychologist John M. Shanken–Kaye, Ph.D., testified on behalf of the Commonwealth, and psychologist Allan M. Tepper, Ph.D., testified on behalf of Appellant. Following the hearing, after finding that the Commonwealth presented clear and convincing evidence

that Appellant is an SVP, Judge Goldberg ordered that Appellant be classified as an SVP. N.T. Megan's Law Hearing, 5/7/04, at 221–22.

¶ 4 On May 10, 2004, the trial court sentenced Appellant to an aggregate of 6 to 12 years' incarceration. Appellant filed a post sentence motion on May 20, 2004, in which he argued that the Commonwealth presented insufficient evidence to establish that Appellant is an SVP. Additionally, Appellant filed a separate motion for extraordinary relief challenging the constitutionality of Megan's Law II.

¶ 5 On September 28, 2004, and November 8, 2004, Judge Goldberg held evidentiary hearings addressing Appellant's constitutional challenges in which each side presented expert witnesses to opine on the effect of factors such as advanced age and sex offender treatment on the incidence of recidivism. Thereafter, both the Commonwealth and Appellant presented oral argument before a three-judge panel of the Bucks County Court of Common Pleas, including Judge Goldberg, the Honorable John J. Rufe, and the Honorable Albert J. Cepparulo. The panel issued an opinion on February 14, 2005, wherein it rejected Appellant's constitutional claims. *See Commonwealth v. Mullins*, 70 Pa. D. & C.4th 462 (Bucks Co.2005). Additionally, Judge Goldberg issued an order on the same date denying Appellant's post sentence motion in which he challenged the sufficiency of the Commonwealth's evidence resulting in his classification as an

---

**1.** A "sexually violent predator" is defined in pertinent part as:

A person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses.

42 Pa.C.S. § 9792. Individuals deemed SVPs are subject to lifetime registration, notification, and counseling requirements upon release from incarceration, as detailed in the statute.

SVP. Appellant filed a timely appeal to this Court.[2]

¶ 6 Appellant presents the following "Statement of Questions Presented," in his brief:

A. DOES A LACK OF JUDICIAL REVIEWABILITY OF [A] SEXUALLY VIOLENT PREDATOR FINDING RENDER PENNSYLVANIA MEGAN'S LAW II UNCONSTITUTIONALLY OVERBROAD AND EXCESSIVE?

B. IS MEGAN'S LAW II UNCONSTITUTIONALLY VAGUE?

C. DID THE TRIAL COURT ERR IN FINDING THAT THE COMMONWEALTH ESTABLISHED BY CLEAR AND CONVINCING EVIDENCE THAT APPELLANT MEETS THE STATUTORY CRITERIA FOR CLASSIFICATION AS A SEXUALLY VIOLENT PREDATOR?

Appellant's brief at 5 ("suggested answers" omitted).

■ ¶ 7 As the first two issues raise challenges to the constitutionality of Megan's Law II, we note:

A statu[t]e will be found unconstitutional only if it clearly, palpably and plainly violates constitutional rights. Under well-settled principles of law, there is a strong presumption that legislative enactments do not violate the constitution. Further, there is a heavy burden of persuasion upon one who questions the constitutionality of an Act.

*Commonwealth v. Long*, 831 A.2d 737, 743 (Pa.Super.2003) (citation omitted).

¶ 8 In his first issue, Appellant argues that Megan's Law II is unconstitutionally overbroad and excessive because it does not provide a mechanism for subsequent judicial review of an offender's SVP designation. In framing this issue for the trial court, Appellant asserted that "Megan's Law II is excessive when viewed as a civil statute and, therefore, must be considered punitive and unconstitutional[.]" *See* Motion for Extraordinary Relief, 4/16/04, at ¶ 10. He notes that the SVP designation is made before sentencing, which is "often years before the individual is released from prison." Appellant's brief at 16. Indeed, just as in the prior and current versions of the law, Megan's Law II indicated that the initial SOAB assessment is made after conviction and prior to sentencing: "[a]t the hearing prior to sentencing the court shall determine whether the Commonwealth has proved by clear and convincing evidence that the individual is a sexually violent predator." 42 Pa.C.S. § 9795.4(e)(3). In further support of his argument that Megan's Law II is unconstitutionally excessive, Appellant states that the prior version of the law, Megan's Law I (*see infra*), provided a mechanism for future review, and that Megan's Law III (*see infra*), the current version of the law, also provides mechanisms for future judicial review; however, he does not specify what these mechanisms were and are. In considering this issue, we first set forth a

**2.** Appellant filed a notice of appeal from the February 14, 2005 order denying his post sentence motions. However, the appeal in this case is, rather, properly taken from the final judgment of sentence, dated May 10, 2004. *See Commonwealth v. Chamberlain*, 442 Pa.Super. 12, 658 A.2d 395, 397 (1995) (stating that "the order denying post-sentence motions acts to finalize the judgment of sentence for purposes of appeal. Thus, the ap-

peal is taken from the judgment of sentence, not the order denying post-sentence motions."). Nevertheless, we note that the caption has been corrected, and we will proceed as if the notice of appeal had indicated that the appeal was being taken from the judgment of sentence rather than the order denying post trial motions. *Commonwealth v. Olavage*, 894 A.2d 808, 809 n. 1 (Pa.Super.2006).

brief background of Megan's Law in its originally enacted and variously amended forms.

¶ 9 Megan's Law was initially enacted in 1995 (known as "Megan's Law I") to "establish[ ] a procedure for adjudicating certain offenders—namely, those that committed one of the predicate offenses listed in the statute—as 'sexually violent predators.'" *Commonwealth v. Gomer Robert Williams*, 574 Pa. 487, 832 A.2d 962, 965 (2003) (*"Williams II"*). Generally, once released from prison, SVPs are subject to lifetime registration, notification, and counseling requirements as detailed in Megan's Law. *See, e.g.*, 42 Pa.C.S. § 9795.1(b) (requiring lifetime registration of SVPs with the Pennsylvania State Police); *id.* at § 9799.4 (requiring lifetime monthly counseling sessions for SVPs). The purpose of the statute, then and now, is

> to protect the safety and general welfare of the people of this Commonwealth by providing for registration and community notification regarding sexually violent predators who are about to be released from custody and will live in or near their neighborhood. It is further declared to be the policy of this Commonwealth to require the exchange of relevant information about sexually violent predators among public agencies and officials and to authorize the release of necessary and relevant information about sexually violent predators to members of the general public as a means of assuring public protection and shall not be construed as punitive.

42 Pa.C.S. § 9791(b). This purpose is supported by various legislative findings, including pronouncements such as: "sexually violent predators pose a high risk of en-

gaging in further offenses even after being released from incarceration or commitments and that protection of the public from this type of offender is a paramount governmental interest[,]" "[p]ersons found to have committed such an offense have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government[,]" and "[r]elease of information about sexually violent predators to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals." *Id.* at § 9791(a)(2), (5), (6).

¶ 10 Notably, Megan's Law I contained a provision, now repealed, whereby an individual designated as an SVP could obtain subsequent SOAB review and reconsideration of his offender status. Even though Appellant fails to cite to or otherwise note the language of this now-repealed section, we believe he is referring to the following:

> **(f) Subsequent board review.**—No sooner than one year prior to release from a State or county correctional institution, or in five-year intervals thereafter, an offender designated as a sexually violent predator may petition the court with original jurisdiction in the matter for reconsideration of the determination. The court may review the determination and request a new report by the board. The court may enter an order terminating the designation in which case the court shall notify the Pennsylvania State Police.

42 Pa.C.S. § 9794(f) *(repealed* May 10, 2000, P.L. 74, No. 18, § 3).[3]

---

3. Another provision, which existed in Megan's Law II, and continues to exist in the current version, Megan's Law III, provides:

> **(g) Parole assessment.**—The Pennsylvania Board of Probation and Parole may request of the board an assessment of an offender or sexually violent predator be conducted

¶ 11 However, in *Commonwealth v. Donald Francis Williams*, 557 Pa. 285, 733 A.2d 593 (1999) ("*Williams I*"), our Supreme Court found certain other provisions of Megan's Law I unconstitutional. In response to the constitutional infirmities announced in *Williams I*,[4] the legislature amended the law in 2000, resulting in what is known as Megan's Law II. In amending the law, the Generally Assembly deleted the above-noted provision, section 9794(f), even though this section was not at issue in *Williams I*. Accordingly, Megan's Law II did not contain a similar mechanism for subsequent SOAB review of an offender's SVP designation.

¶ 12 Subsequently, Megan's Law II also came under various constitutional challenges, resulting in the Supreme Court's opinion in *Williams II*. In *Williams II*, the Supreme Court found that the registration, notification, and counseling provisions of Megan's Law II were not punitive in nature.[5] In reaching this conclusion, the Court relied on a variety of factors derived from cases wherein the task was to determine whether otherwise civil or remedial legislation should be deemed penal for constitutional purposes. As further described below, one of these factors involved an analysis of whether the statute was unconstitutionally excessive.

¶ 13 Specifically, the *Williams II* Court employed a "two-level formulation" derived from the United States Supreme Court case of *Smith v. Doe I*, 538 U.S. 84, 123 S.Ct. 1140, 155 L.Ed.2d 164 (2003), which, in turn, utilized factors that had been set forth in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (the "*Mendoza–Martinez* factors"). The two-level inquiry is described as, first, determining "whether the legislature's intent was to impose punishment, and, if not, whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *Williams II*, 832 A.2d at 971.

¶ 14 The *Williams II* Court first determined that the legislative intent underlying Megan's Law II "is to identify potential recidivists and avoid recidivism by providing awareness of particular risks to members of the public and treatment to offenders." *Id.* The legislature's stated intent, noted above, was not retribution but, rather, provided "a system of registration and notification so that relevant information would be available to state and

---

and provide a report to the Pennsylvania Board of Probation and Parole prior to considering an offender or sexually violent predator for parole.

42 Pa.C.S. § 9795.4(g). Although this provision appears to provide for future assessment, it is silent on the issue of whether such an assessment may result in reconsideration or termination of SVP status. Thus, no provision similar to section 9794(f) (*repealed*), as it existed in Megan's Law I, *supra*, existed in Megan's Law II. Moreover, as further discussed, *infra*, a more limited mechanism for review and exemption from some notification procedures was put into place upon the enactment of Megan's Law III, which became effective on January 4, 2005. *See* 42 Pa.C.S. § 9795.5 ("Exemption from certain notifications").

4. Specifically, the *Williams I* Court found that Megan's Law I did not comport with due process because the burden was placed on the convicted sex offender to rebut a presumption that he was an SVP, and that SVP status impermissibly increased the maximum term of confinement above the statutory maximum for the underlying offense.

5. However, the Court did conclude that another provision, whereby "prescribed penalties for failure to register and verify one's residence as required [, which penalties included potential lifetime incarceration under Megan's Law II,] [were] unconstitutionally punitive, but severable." *Williams II*, 832 A.2d at 986.

local law enforcement officials in order to provide the safety and general welfare of the public." *Id.* at 972 (quoting *Commonwealth v. Gaffney*, 557 Pa. 327, 733 A.2d 616, 619 (1999)). Accordingly, "the General Assembly's intent in enacting Megan's Law II was not to punish, but to promote public safety through a civil, regulatory scheme." *Id.*

¶ 15 In conducting the second part of the two-level inquiry, the *Williams II* Court proceeded to examine the *Mendoza–Martinez* factors, which, although not exhaustive or dispositive, *see id.* at 972, are helpful in determining "whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent[,]" *id.* at 971. The *Mendoza–Martinez* factors are:

(1) whether the sanction involves an affirmative disability or restraint; (2) whether it has historically been regarded as punishment; (3) whether it comes into play only on a finding of scienter; (4) whether its operation will promote the traditional aims of punishment-retribution and deterrence; (5) whether the behavior to which it applies is already a crime; (6) whether an alternative purpose to which it may rationally be connected is assignable for it; and (7) **whether it appears excessive in relation to the alternative purpose assigned.**

*Id.* at 973 (emphasis added). The *Williams II* Court stated that "only the clearest proof that a law is punitive in effect may overcome a legislative categorization to the contrary." *Id.* (citation and quotation marks omitted). "Clearest proof" in this context means that "the *Mendoza–Martinez* factors must weigh heavily in favor of a finding of punitive purpose or effect in order to negate the General Assembly's intention that the Act be deemed civil and remedial." *Id.* The

*Williams II* Court proceeded to examine each of the *Mendoza–Martinez* factors to conclude, ultimately, that the registration, notification, and counseling requirements were not punitive.

¶ 16 Most relevant to the issue in the instant appeal, however, is the last *Mendoza–Martinez* factor the *Williams II* Court addressed, which involves an examination of excessiveness when determining whether a statute has a punitive effect. With regard to this factor, the *Williams II* Court concluded that the registration, notification, and counseling provisions of Megan's Law II "appear reasonably designed to serve the government's legitimate goal of enhancing public awareness and ensuring that offenders do not relapse into harmful behavior." *Id.* at 981. The Court explained:

Counseling serves the rehabilitative and prophylactic purposes subsumed by that goal, and the registration/notification measures appear calculated to advance appropriate public awareness. In this regard, it has been noted that "Congress, and the legislatures of the several states, have considered the egregiousness of sexual crimes, particularly where children are concerned, and studies have indicated that sexual offenders have high rates of recidivism." *Cutshall [v. Sundquist]*, 193 F.3d [466,] 476 [ (6th Cir.1999) ]; *see also McKune v. Lile*, 536 U.S. 24, 34, 122 S.Ct. 2017, 2024, 153 L.Ed.2d 47 (2002) ("When convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sexual assault."). . . . Thus, although the duty to register with the police and verify one's residence quarterly may seem onerous to the sexually violent predator, the question is whether it is sufficiently so to transform an otherwise remedial statute into a punitive one.

*See Doe v. Pataki,* 120 F.3d 1263, 1285 (2d Cir.1997) (reasoning that quarterly in-person registration, while onerous, is non-punitive, inasmuch as the Supreme Court "has consistently upheld far heavier burdens against *ex post facto* challenges, including deportation, termination of financial support, and loss of livelihood"). Concerning this inquiry, the *Artway* court [*i.e., Artway v. Attorney General of State of N.J.,* 81 F.3d 1235 (3d Cir.1996) ] indicated that

> [t]he caselaw does not tell us where the line falls that divides permissible from impermissible effects, but we know the "matter of degree" is somewhere between imprisonment and revocation of citizenship on the one hand, and loss of a profession or benefits on the other.

*Id.* at 1266 (comparing *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987) (increased incarceration constitutes punishment), and *Trop v. Dulles,* 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958) (citizenship revocation constitutes punishment), with *De Veau v. Braisted,* 363 U.S. 144, 80 S.Ct. 1146, 4 L.Ed.2d 1109 (1960) (forbidding work as union official is not punishment), *Hawker v. People of New York,* 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002 (1898) (revoking one's medical license is not punishment), and *Flemming v. Nestor,* 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960) (terminating social security benefits is not punishment)).

The [court in *E.B. v. Verniero,* 119 F.3d 1077 (3d Cir.1997),] expanded upon these observations by noting that the effects of a measure must be "extremely onerous" to constitute punishment, as even the deprivation of one's livelihood does not qualify. *See Verniero,* 119 F.3d at 1101. The court recognized, moreover, that the challenged statute's effects must be evaluated in light of the importance of the governmental interest involved.... Turning to the challenged provisions of New Jersey's registration and community notification requirements, the panel stated:

> The direct effects of Megan's Law clearly do not rise to the level of extremely onerous burdens that sting so severely as to compel a conclusion of punishment. All Megan's Law mandates is registration and notification. Under Megan's Law, New Jersey has not deprived appellants of their freedom or their citizenship. The state has imposed no restrictions on a registrant's ability to live and work in a community, to move from place to place, to obtain a professional license or to secure governmental benefits.

\* \* \* \* \* \*

> [*Kansas v.*] *Hendricks* [, 521 U.S. 346, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997) ], and the long line of cases on which it relies, counsels that bona fide remedial legislation may inflict very substantial individual hardship without [constituting punishment]. It necessarily follows that some limit must be placed on the situations in which a measure's sting alone, despite its remedial purpose and effect, will constitute punishment under [the Ex Post Facto and Double Jeopardy] clauses, and that classification as punishment on the basis of sting alone must be reserved for cases involving deprivation of the interests most highly valued in our constitutional republic.

*Verniero,* 119 F.3d at 1102–03. The court went on to conclude, relying upon *Hendricks,* that the state's interest in protecting the public against sexually violent predators is so great that it justifies the adverse effects that community

notification might have upon the registrant. *See id.* at 1104.

*Williams II,* 832 A.2d at 981–82.

¶ 17 In agreeing with the analysis in *Verniero,* the *Williams II* Court concluded as follows:

[T]he duties imposed upon the sexually violent predator with regard to registration, verification, and counseling, are not in themselves sufficiently onerous to qualify as punishment based upon alleged excessiveness. *See generally Smith [v. Doe I],* 538 U.S. [84,] 105, 123 S.Ct. [1140,] 1154[, 155 L.Ed.2d 164 (2003) ] (indicating that the crux of the excessiveness inquiry is not "whether the legislature has made the best choice possible," but "whether the regulatory means chosen are reasonable in light of the nonpunitive objective" sought to be achieved).

*Id.* at 982. However, the *Williams II* Court then made the following observations:

Still, one of the most troubling aspects of the statute is that the period of registration, notification, and counseling lasts for the sexually violent predator's entire lifetime. A reasonable argument could be made that, to avoid excessiveness, the Legislature was required to provide some means for a sexually violent predator to invoke judicial review in an effort to demonstrate that he no longer poses a substantial risk to the community. This aspect of the statute may be particularly problematic if the definition of "sexually violent predator" is incapable of reasonably precise implementation, as explained below. Notably, however, the position that a means for subsequent judicial review is a necessary feature of any valid registration/notification scheme assumes that, given sufficient time and/or treatment, sexually violent predators can be fully cured of the

"mental abnormality or personality disorder [making them] likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9792 (defining "sexually violent predator"). As the record is devoid of any information concerning the prospect of successful treatment of such individuals, the presumption of constitutionality enjoyed by all validly enacted legislation, *see Commonwealth v. Means,* 565 Pa. 309, 315, 773 A.2d 143, 147 (2001), remains unrebutted. *Cf. Commonwealth v. Fleming,* 801 A.2d 1234, 1240–41 (Pa.Super.2002) (concluding that Megan's Law II's extension of the registration term for certain offenders from ten years to life did not constitute punishment).

*Williams II,* 832 A.2d at 982–83 (footnote omitted).

¶ 18 As the trial court in the instant case noted, it is not clear if the *Williams II* Court, based on the excerpt above, intended that a petitioner establish that he was *no longer a substantial risk to the community* or that he was *fully cured* in order to merit termination of his SVP designation. Nevertheless, as explained below, we agree with the trial court that Appellant in the instant case met neither evidentiary standard to warrant finding Megan's Law II unconstitutional on the basis of excessiveness. *Mullins,* 70 Pa. D. & C.4th at 474 n. 5.

¶ 19 Appellant directs us to the hearings held before Judge Goldberg on September 28, 2004, and on November 8, 2004, where Appellant was permitted to present evidence in support of his constitutional arguments. He argues that his expert attested that factors like increased age, decreased testosterone, and specialized sex offender treatment decrease the rate of recidivism, which may impact whether an offender should remain classified as an SVP for his entire life. Although Appellant notes that

even his expert agreed that there is no cure for pedophilia, he argues the evidence establishes that pedophilia may be managed such that an offender would no longer pose a substantial risk to the community, apparently adopting the lower of the two possible standards mentioned in *Williams II*. *Williams II*, 832 A.2d at 982–83.

¶ 20 The three-judge panel of the trial court, which heard oral argument on this issue, examined the two-level analysis set forth in *Mendoza–Martinez*, and adopted in *Williams II*. First, the trial court recognized that the *Williams II* Court concluded that the registration, notification, and counseling requirements of Megan's Law II were not punitive; however, the *Williams II* Court expressed its concerns regarding the lack of a provision for subsequent judicial review of SVP status. As noted above, the *Williams II* Court could not address this particular issue because the record in that case was "devoid of any information concerning the prospect of successful treatment of such individuals[.]" *Mullins*, 70 Pa. D. & C.4th at 473 (quoting *Williams II*, 832 A.2d at 982–83). Thus, the trial court stated that the *Williams II* Court "left open the question of whether Megan's Law II could withstand a constitutional challenge in a case where the evidence on record rebuts the underlying legislative findings and/or proves the possibility of successful treatment for SVPs, inviting challengers to establish such a record." *Id.* at 473–74. The three-judge panel in the instant case thoroughly examined the evidence submitted by both parties on this issue and concluded, ultimately, that Appellant did not meet the heavy evidentiary burden of establishing that the lack of a mechanism for judicial review of SVP status renders Megan's Law II unconstitutionally excessive. We reproduce portions of the panel's thoughtful and well-reasoned analysis herein:

Petitioner in the case before us faces the same formidable burdens placed upon other challengers to the Megan's Law II legislation. To overcome these burdens, petitioner must show that Megan's Law II is punitive in nature and therefore required to conform to due process standards. Because the court in *Williams II* clearly indicated that the intent of the legislature was non-punitive, petitioner must show that the *Mendoza–Martinez* factors weigh heavily in favor of a finding of unconstitutionality to be successful in his claim. Because the court in *Williams II* addressed these factors and left open only the possibility that another record might establish excessiveness, petitioner can only be successful by creating an adequate record on the issue of excessiveness. Ultimately, petitioner must provide this court with sufficient evidence to show that the lifetime registration, notification and counseling provisions of Megan's Law II are sufficiently onerous so as to be excessive in relation to the law's non-punitive purpose of community safety and protection.

As indicated by the court in *Williams II*, petitioner must demonstrate that there is no substantial risk to the community, or that there is the potential for a full cure of the underlying mental abnormality or personality disorder before the lack of judicial review can be found to be excessive. Based on the record before us, we find that petitioner has not provided sufficient evidence to comply with either of these standards.

While the statute and the court in *Williams II* used the term "mental abnormality" in addition to "personality disorder," the term "mental abnormality" is not a psychiatric term. (N.T. 9/28/04, pp. 110, 255–56.) Therefore, we

address the issue of whether our record shows the potential for a full cure in terms of personality disorders. Petitioner's evidence submitted at the Megan's Law hearing did not establish that he is curable of any personality disorder. (N.T. 9/28/04, pp. 205, 210.) The Commonwealth's expert, Dr. Veronique Valliere, testified that certain diagnosable conditions, such as pedophilia and paraphilia, are not capable of being cured. (N.T. 9/28/04, pp. 204, 210.) Dr. Valliere testified that doctors do not know how to cure individuals with sexual deviances that motivate sexual crimes and that there is always a potential for such individuals to re-offend in their lifetime. (N.T. 9/28/04, p. 205.) Petitioner's expert witness, Dr. Timothy Foley, also acknowledged that there is no cure for pedophilia and [psychologists] "don't talk about cures very often." (N.T. 9/28/04, p. 143.) Dr. Foley himself testified that if a person has been convicted of a sexual offense and has been found to have a personality disorder, such as pedophilia, paraphilia or antisocial disorder, there is always a risk that that person may re-offend. (N.T. 9/28/04, pp. 174–75.) Based on the content of the record, petitioner has failed to show that a full cure of the underlying personality disorder is possible.

Petitioner has also failed to provide evidence that an SVP may pose a risk that is insubstantial to his or her community after the passage of time and/or the completion of treatment. Much of the expert testimony examined the relationship between age and sexual recidivism. The evidence did not establish that, as an SVP ages, he or she no longer poses a substantial risk to the community. Defendant's expert witness, Dr. Foley, testified that studies show testosterone decreases as age increases and, as a result, sexual offense recidivism decreases with age. (N.T. 9/28/04, p. 55.) Dr. Valliere rebutted the findings of the testosterone studies by noting that such studies failed to take factors such as health, access to victims, and ageism,[6] into account. (N.T. 9/28/04, p. 221.) Moreover, Dr. Valliere cited R. Karl Hanson's literature[7] that, for certain types of offenders, such as those with pedophilia, persistent deviant sexual arousal does not decrease with age. (N.T. 9/28/04, pp. 221–22.) Because petitioner bears a heavy burden of proof and because the literature discussing the relationship between age and recidivism is conflicting and inconclusive, petitioner's evidence regarding age and recidivism is insufficient to meet his burden.

---

6. Ageism refers to a known reluctance to convict the elderly. (N.T. 9/28/04, p. 221.)

7. R. Karl Hanson, corrections researcher of the Department of the Solicitor General of Canada, was frequently cited by both petitioner's and the Commonwealth's experts for his literature on sexual offender recidivism. See defendant's supplemental brief to the memorandum of law based on evidentiary hearings, exhibit H: R. Karl Hanson and Monique T. Bussiere, *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, Journal of Consulting and Clinical Psychology, vol. 66, no. 2 (1998).

Petitioner also presented evidence that completion of sex offender treatment lowers the risk of recidivism. (N.T. 9/28/04, pp. 57–58.) Petitioner's own expert, however, testified that "a variety of data" exists, that reaches differing conclusions about the effectiveness of treatment in lowering the recidivism rate. (N.T. 9/28/04, p. 58.) As such, petitioner has failed to offer evidence that would establish Megan's Law II is excessive as a civil statute and, thus, unconstitutionally punitive.

*Id.* at 475–78. The trial court panel's findings are supported by the record, and we agree with, and adopt, its well-reasoned analysis. Accordingly, we agree that Appellant failed to meet the high evidentiary standard required to establish that the lack of a mechanism for subsequent judicial review and possible termination of SVP status renders the lifetime registration, notification, and counseling requirements of Megan's Law II unconstitutionally excessive.[6]

¶ 21 In his second issue, Appellant contends that Megan's Law II is void for vagueness on two grounds: first, that certain terms of the statute are vague and imprecise and, second, that the SOAB assessment procedures are unreliable. With regard to a challenge that a statute is unconstitutionally vague, our Supreme Court stated recently:

> A statute may be deemed to be unconstitutionally vague if it fails in its definiteness or adequacy of statutory expression. This void-for-vagueness doctrine, as it is known, implicates due process notions that a statute must provide reasonable standards by which a person may gauge his future conduct, *i.e.*, notice and warning.

*Commonwealth v. Ludwig,* 583 Pa. 6, 874 A.2d 623, 628 (2005).

¶ 22 Appellant argues that the terms "sexually violent predator," "personality disorder," "mental abnormality," "predatory," and "likely," are unconstitutionally vague. Appellant's brief at 25–26. In rejecting Appellant's claim, we rely upon the following cases: *Commonwealth v. Howe,* 842 A.2d 436, 445 (Pa.Super.2004) (concluding that the terms "sexually violent predator," "personality disorder," "mental abnormality," and "likely to engage in," were not impermissibly vague); *Commonwealth v. Kopicz,* 840 A.2d 342, 348 (Pa.Super.2003) (concluding term "sexually violent predator" was not unconstitutionally vague); and, *Commonwealth v. Rhoads,* 836 A.2d 159, 163 (Pa.Super.2003) (same).

¶ 23 Also in support of his vagueness argument, Appellant refers to the following portion of the *Williams II* Court's opinion, in which the Court was addressing an argument presented by *amicus curiae* in that case:

> Amicus Defender Association of Philadelphia ... additionally maintains that the statute is impermissibly vague, in that it fails to allow for a sufficiently precise understanding of who is or is not a sexually violent predator. As [the defendant's] void for vagueness challenge was not addressed by the trial court, and the matter will be remanded for consideration of this claim, any imprecision in the Act's provisions must presently be evaluated in terms of whether it renders the statute unconstitutionally punitive through excessiveness. Primarily, if the Act's imprecision is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be exces-

---

6. Moreover, we note that the General Assembly amended Megan's Law II in 2004, with an effective date of January 24, 2005 (known as "Megan's Law III"). Although Megan's Law III contains no provision comparable to the now-repealed section 9794(f) of Megan's Law I providing for subsequent board review of an SVP designation, it does contain a provision whereby an SVP can petition for exemption from certain other notification provisions. 42 Pa.C.S. § 9795.5. We see no reason why Appellant could not utilize this provision to petition for subsequent review and possible exemption from certain notification provisions, even though this new section does not appear to provide for termination of SVP status.

sive in relation to the remedial purposes served. This could be accomplished in multiple ways. For example, [defendants] ... could establish that the offender assessment process is so unreliable that there will be little correlation between those ultimately deemed sexually violent predators and the class of individuals who pose the greatest risk of predation.

*Williams II*, 832 A.2d at 983. However, the *Williams II* Court went on to state that "any conclusion that an assessment of sexually violent predator status is so arbitrary that the consequences to the individual so adjudicated constitute punishment, would have to be grounded upon credible record evidence that the enumerated criteria were non-predictive, or that assessment pursuant to them was inherently unreliable." *Id.* at 984 (footnote omitted). Nevertheless, the *Williams II* Court did not have a record developed on this issue upon which to conclude if the defendant did or did not sustain his burden to establish excessiveness by "clearest proof." *Id.*

¶ 24 In the instant case, Appellant asserts that he has established such a record by presenting evidence that the SOAB assessment process is unreliable because, for example, the SOAB does not use actuarial tools to determine the risk of recidivism and because the SOAB generally does not interview offenders. Appellant's brief at 21–22. The trial court panel opined as follows:

[T]he Commonwealth's expert, Dr. Valliere, testified that the SOAB utilizes empirically-guided clinical judgment to make assessments regarding whether an offender is recommended for SVP status. (N.T., 11/08/04, p. 30.) Petitioner's expert, Dr. Foley, testified that actuarial tools are "significantly more accurate" than clinical judgment and that actuarial methods are "state of the art" in terms

of making assessments. (N.T., 09/28/04, pp. 89, 105.) In response, Dr. Valliere testified that clinical judgment and empirically-guided clinical judgment are two different processes. (N.T., 11/08/04, pp. 27–28.) Foley essentially conceded this point and admitted that there is "not a huge difference when you have a correctly administered actuarial versus correctly administered explicitly defined empirically-guided clinical judgment." (N.T. 09/28/04, p. 156.)

As we have repeatedly emphasized in this opinion, petitioner faces a heavy burden to clearly demonstrate the unconstitutionality of Megan's Law II. The operative inquiry to determine the unconstitutionality of the methods of prediction employed by the SOAB is not whether the methods are state of the art or even the most accurate available methods. The operative inquiry is whether the methods employed are so unreliable as to produce little correlation between offenders deemed SVPs and individuals who actually pose the greatest risk of predation. That record has not been established.

Here, Dr. Foley, while maintaining that more state of the art methods are available, admitted that the methods used by the SOAB produce results that are not significantly different from results produced by the state of the art methods. This evidence does not approach the level of proof needed to overcome petitioner's burden. Therefore, based on the record before us, we decline to find that the methods used by the SOAB in assessing SVP status are so vague as to be unconstitutional.

*Mullins*, 70 Pa. D. & C.4th at 482–83. Our review reveals that the trial court's findings are supported by the record. Additionally, we agree with, and adopt, the panel's thorough, well-reasoned analysis.

 ¶ 25 Finally, Appellant asserts that the Commonwealth failed to present clear and convincing evidence to support Judge Goldberg's decision to classify him as an SVP.

A challenge to the sufficiency of the evidence is a question of law subject to plenary review. We must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, is sufficient to support all elements of the offenses. A reviewing court may not weigh the evidence or substitute its judgment for that of the trial court.

At a hearing prior to sentencing the court shall determine whether the Commonwealth has proved by clear and convincing evidence that the individual is a sexually violent predator. In reviewing the sufficiency of the evidence regarding the determination of SVP status, we will reverse the trial court only if the Commonwealth has not presented clear and convincing evidence sufficient to establish each element required by the statute. Where, as here, the trial court has provided specific findings of fact, we will determine whether the record supports those findings, and then review the legal conclusions drawn therefrom.

*Commonwealth v. Snyder*, 870 A.2d 336, 346–47 (Pa.Super.2005) (citations and quotation marks omitted). "Furthermore, a fact-finder is free to believe all, part or none of the evidence presented." *Commonwealth v. Moody*, 843 A.2d 402, 408 (Pa.Super.2004) (citation omitted).

¶ 26 An SVP is defined in pertinent part as follows:

A person who has been convicted of a sexually violent offense as set forth in section 9795.1 (relating to registration) and who is determined to be a sexually violent predator under section 9795.4 (relating to assessments) due to a mental abnormality or personality disorder that makes the person likely to engage in predatory sexually violent offenses. 42 Pa.C.S. § 9792. "Mental abnormality" is defined as "[a] congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." *Id.* Megan's Law II, prior to the 2004 amendment, defined "predatory" as "[a]n act directed at a stranger or at a person with whom a relationship has been established or promoted for the primary purpose of victimization." *Id.* Additionally, Megan's Law II set forth various assessment criteria including consideration of the facts of the offense, any prior offense history, characteristics of the offender, and factors related to the risk of reoffense. *Id.* at § 9795.4.

¶ 27 The record in the instant case reveals that Judge Goldberg did not err by concluding that the Commonwealth presented clear and convincing evidence to establish that Appellant should be classified as an SVP. The SOAB appointed Dr. Shanken–Kaye to perform Appellant's assessment, and Dr. Shanken–Kaye testified in support of his recommendation, made to a reasonably degree of certainty, that Appellant met the criteria to be classified as an SVP. N.T. Megan's Law Hearing, 5/7/04, at 32.

¶ 28 Dr. Shanken–Kaye opined that Appellant had the mental abnormality of pedophilia, in that he engaged in an ongoing relationship of a predatory nature with his victim. *Id.* at 32–33. He concluded that Appellant had a deviate sexual arousal to young children, *i.e.,* 13 years old or younger, and that he acted on these urges,

which caused problems in his interpersonal relationships. *Id.* at 34, 36. Appellant acted repeatedly to satisfy these urges over a prolonged period of time. *Id.* at 35. Dr. Shanken–Kaye concluded that Appellant established two relationships with the victim—one, the "daytime" or stepfather-stepdaughter relationship and, two, the relationship he promoted and maintained with the victim for his own sexual gratification, which he engaged in during the victim's mother's absence from the home. *Id.* at 39. Moreover, Appellant initiated the sexual relationship when the victim was only 7 years old. *Id.* Prior to episodes of sexual abuse, Appellant would tell the victim that he had "plans for us tonight" or he would say, "I have plans for oral tonight." *Id.*

¶ 29 Additionally, Appellant gave preferential treatment to the victim in order to "solidify future sexual relations by being particularly nice and particularly giving to the victim." *Id.* at 40. Dr. Shanken–Kaye testified that the victim reported that "at times [Appellant] treated her better than he treated other people in the household, and that it was her opinion, ... that this was directly related to the sexual behavior and that this was, in fact, a factor that encouraged her to continue with the sexual behavior." *Id.* When, ultimately, the victim rejected Appellant's sexual demand (*i.e.*, one or two nights before she revealed the crime to authorities), she was concerned that Appellant would become angry and that she was afraid of his anger. *Id.* at 44. Dr. Shanken–Kaye opined that, not only did Appellant put significant time, planning, and effort into his sexual abuse of the victim, but that he maintained the relationship through a "combination of preferential treatment and anger or displeasure...." *Id.* at 45. Dr. Shanken–Kaye concluded that Appellant engaged in "grooming behavior" with the victim by using this preferential treatment and

threats of anger to make the victim more susceptible to his sexual advances. *Id.* at 46.

¶ 30 Dr. Shanken–Kaye also opined that Appellant was likely to commit future offenses based on the SOAB assessment factors he considered. *Id.* Dr. Shanken–Kaye indicated that the records he reviewed revealed that Appellant did not complete any offender-specific therapy. *Id.* at 52–53. Dr. Shanken–Kaye also noted that Appellant demonstrated no remorse for his actions, that he did not voluntarily come forward but, rather, only admitted to the abuse after the victim reported it, and there was no evidence that he would have altered his conduct had the victim not reported the abuse. *Id.* at 56–57. Additionally, it was noted that Appellant entered a guilty plea only after it became clear that the victim would inculpate him at trial, thereby bolstering Dr. Shanken–Kaye's opinion that Appellant was likely to reoffend due to a lack of remorse. *Id.* Dr. Shanken–Kaye summarized his opinion:

> My opinion, based on both the nature of the mental abnormality, that of pedophilia, and also on the extremely compulsive nature of the predatory behavior in this relationship, the long period of time and the care that was given to maintaining the secrecy, and the frequency of the sexual behavior, it was my opinion that if put in a situation where it was possible to reoffend against young children, it would be likely that [Appellant] would do so.

*Id.* at 54.

¶ 31 Appellant, on the other hand, presented the testimony of Dr. Tepper, who did not perform an assessment in this case but, rather, reviewed Dr. Shanken–Kaye's assessment and merely rendered an opinion on various alleged deficiencies in Dr.

Shanken–Kaye's assessment. Nevertheless, Judge Goldberg concluded that Dr. Tepper did not have the level of experience that Dr. Shanken–Kaye had in performing SVP assessments. Judge Goldberg was free to disregard all or any part of Dr. Tepper's opinion. *Moody,* 843 A.2d at 408.

¶ 32 Accordingly, Judge Goldberg specifically credited Dr. Shanken–Kaye's testimony based on his qualifications and experience in the performance of SVP assessments. N.T. Megan's Law Hearing, 5/7/04, at 217. Thus, Judge Goldberg concluded that the evidence overwhelmingly established that Appellant "has an extreme and significant mental abnormality, that is, pedophilia." *Id.* at 218. Judge Goldberg acknowledged the details of the prolonged sexual abuse, the evidence of Appellant's preferential treatment of the victim and grooming behavior, his planning and premeditation, his taking the opportunity to abuse the victim when her mother was out of town, and his lack of remorse or sense of responsibility. *Id.* at 218–220. The court credited Dr. Shanken–Kaye's opinion that Appellant is likely to reoffend due to his mental abnormality, the relationship he established with the victim, the compulsive and manipulative behavior he engaged in, and the facts and circumstances of the underlying offenses. *Id.* at 221. Given that the record supports Judge Goldberg's findings, we affirm Judge Goldberg's decision classifying Appellant as an SVP.

¶ 33 Judgment of sentence affirmed.